IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
**CASE No. 1:26-cv-23904-XXXX**


JOSHUA HOLT;
DEREK JASON HOLT;
THAMARA B. HOLT;
ANTHONY B. JASON HOLT;
KATIE JILL HOLT;
JENNA LEE NEMETH;
CARLOS EDUARDO MARRÓN;
MARIA ALEJANDRA ALFONZO;
CARLOS RAFAEL MARRÓN; and
S.A., A MINOR; M.L., A MINOR;
and N.C., A MINOR


      Plaintiffs,                               **JURY TRIAL**
                                                  **DEMANDED**

vs.

PETROLEOS DE VENEZUELA, S.A.
A.K.A. PDVSA and
CORPORACION VENEZOLANA DEL PETROLEO
A.K.A. CVP.


      Defendants.

_____/

**TABLE OF CONTENTS**

COMPLAINT ................................................................................................................ 3
INTRODUCTION ........................................................................................................ 3
PARTIES ...................................................................................................................... 5
JURISDICTION AND VENUE .................................................................................... 7
THE FOREIGN SOVEREIGN IMMUNITIES ACT .................................................. 11
FACTUAL ALLEGATIONS ........................................................................................ 19
PDVSA's Terrorism Against U.S. Citizens, Including the Plaintiffs ........................... 19
A. PDVSA Has Utilized Its Airplanes In The Kidnapping of US Citizens ................... 19
B. PDVSA Utilizes Its Airplanes For Narcoterrorism That Harms US Citizens and Funds Venezuelan Terrorists ..................................................................................................... 20
C. PDVSA Utilizes Its Airplanes To Smuggle Cash To Fund Crime In the United States .......... 24
D. PDVSA Launders Money To, From, and Through the United States To Support Venezuelan Terrorists ....................................................................................................................... 24
E. PDVSA Shared Maduro's Anti-American Terrorist Objectives ............................... 29
F. OFAC's Designation of PDVSA ............................................................................... 31
CVP's Terrorism Against U.S. Citizens, Including the Plaintiffs ................................ 32
A. Overview of CVP ...................................................................................................... 32
B. CVP Provides Material Support to Maduro, Fostering His Authoritarian Control of Venezuela ..................................................................................................................... 33
The Venezuelan Criminal Conspiracy and the Venezuelan Criminal Enterprise ......... 55
The Kidnapping and Torture of Plaintiffs .................................................................... 57
COUNT I — Violation of the Federal Anti-Terrorism Act, 18 U.S.C. § 2333 ............ 72
COUNT II — Violation of the Florida Anti-Terrorism Act, Fla. Stat. § 772.13 .......... 83
COUNT III — Furthering or Facilitating Terrorism in Violation of Florida ATA ....... 88
COUNT IV — Common Law Conspiracy ................................................................... 91
COUNT V — Federal Civil RICO, 18 U.S.C. § 1964(c) ............................................ 92
COUNT VI — Conspiracy to Violate Federal Civil RICO, 18 U.S.C. § 1962(d) ....... 97
PRAYER FOR RELIEF ............................................................................................... 98

**COMPLAINT**

Plaintiffs Joshua Holt, Derek Jason Holt, Thamara B. Holt, Anthony B. Holt, Katie Jill Holt, Jenna Lee Nemeth née Holt (the "Holt Family"), as well as Carlos Eduardo Marrón, Maria Alejandra Alfonzo, Carlos Rafael Marrón, and S.A., a minor (the Marrón Family), bring this action for violations of the federal Anti-Terrorism Act, 18 U.S.C. § 2333 et seq (the "ATA"), violations of the Florida Anti-Terrorism Act (the "Florida ATA"), violations of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), and conspiracy, against Defendants Petroleos de Venezuela ("PDVSA") and Corporacion Venezolana de Petroleo ("CVP"), and plead as follows:

**INTRODUCTION**

1. PDVSA has a long history of committing acts of terrorism against U.S. citizens, including the Plaintiffs. PDVSA—cloaked in nominal "legitimacy" as the Venezuelan state oil company, and thus with a fleet of airplanes and billions of dollars in oil transactions at its disposal—has at all relevant times been uniquely well positioned both to commit acts of terrorism and to evade detection of its crimes.

2. During the illegitimate regime of Venezuelan dictator Nicolas Maduro ("Maduro"), who was removed 2026, leaving one of his principal deputies to take his place, PDVSA engaged in terrorism against U.S. citizens and others regularly and with impunity. Whether PDVSA will begin to act lawfully under the new Venezuelan regime of President Delcy Rodriguez, which the United States recognized as the legitimate government of Venezuela in March 2026, remains to be seen. Notably, however, PDVSA has not announced that it is withdrawing from, nor otherwise disavowing, any of the Maduro-era conspiracies described herein, in which PDVSA actively participated for years.

2

3.       In any event, throughout the time discussed herein, PDVSA made a practice of using its planes to commit acts of terrorism against U.S. citizens.  Among other things, PDVSA utilized its planes (and/or the planes of its subsidiaries that unswervingly followed PDVSA's dictates) to (a) ferry U.S. kidnapping victims between locations, (b) smuggle narcotics to the United States to further Venezuelan narcoterrorism designed to injure the health and wellbeing of the U.S. populace, and (c) smuggle bulk cash into the United States for the specific purpose of expending the smuggled funds to foment violence and crime in the United States.

4.       In addition, at all relevant times, PDVSA routinely provided direct funding and money laundering services for the benefit of itself and other Venezuelan terrorists, such as Maduro and the Venezuelan drug cartel known as the Cartel of the Suns (aka Cartel de los Soles).  On November 24, 2025, the U.S. Department of State designated the Cartel de los Soles as a Foreign Terrorist Organization ("FTO") under 8 U.S.C. § 1189.  See 90 Fed. Reg. 53,045 (Nov. 24, 2025).  As U.S. courts recognize, the act of providing monetary donations and financial services directly to terrorists constitutes terrorism, giving rise to primary liability under the federal Anti-Terrorism Act ("ATA") and the Florida Anti-Terrorism Act ("Florida ATA").  *See, e.g., Albán v. Maduro*, 1:21-cv-20706 (S.D. Fla.), at ECF 56 (Report & Recommendation) ("Plaintiffs have plausibly alleged . . . two types of terrorism that injured Plaintiffs," the first of which is "narcoterrorism and related terror financing"), *adopted* at ECF No. 58.  That is especially true where, as is the case with PDVSA and CVP, the party providing the funds and financial services shares the terrorists' nefarious objectives.

5.        CVP, as a wholly owned subsidiary of PDVSA whose management shared PDVSA's terroristic aims, assisted PDVSA in committing acts of terrorism against U.S. citizens including Plaintiffs.  CVP was a willing and critical node in PDVSA's money laundering network

3

that was vital to supporting Venezuelan terrorism against U.S. citizens. CVP's terrorist acts included providing funding and financial services to PDVSA, Maduro, the Cartel, and other Venezuelan terrorists. Among other things, CVP was instrumental in thieving Venezuelan oil and perpetrating oil-industry graft, funneling profits to support Maduro's patronage system and ensuring that Maduro enjoyed the continued support of Venezuelan civil elites, military leaders, and Cartel bosses. CVP's criminality bolstered Maduro's authority, creating a vicious cycle in which Maduro then leveraged his power to allow criminal conduct to thrive.

6. During the illegitimate Maduro regime, Plaintiffs Joshua Holt, Thamy Holt, and Carlos Marrón were kidnapped, tortured, and held hostage. The kidnapping, hostage taking, and torture of Joshua Holt, Thamy Holt, and Carlos Marrón,, in turn, injured the other Plaintiffs (who are their relatives), both physically and emotionally. Certain family members of the kidnaped victims were further injured when the kidnappers contacted them in the United States, to extort money by threatening the kidnapped victims. Plaintiffs also suffered devastating losses to business and property, e.g., to their businesses that collapsed while they were held hostage, to their bank accounts that the kidnappers looted.

7. Defendants PDVSA and CVP caused Plaintiffs' injuries by providing massive flows of critical funding and other essential services, including money laundering, that supported the kidnappers. *See Marrón v. Maduro,* 1:21-cv-23190, ECF No. 44 ("Defendants' violations of the Florida Anti-Terrorism Act - using narcotics sales in Florida to fund their acts of terrorism at home - gave rise to Mr. Marrón's injuries").

## **PARTIES**

8. Plaintiff Joshua ("Josh") Holt is a citizen of the United States residing in Riverton, Utah with his wife Thamara ("Thamy") B. Holt, their newborn children O.H and B.H., as well as

4

N.C. and M.L., Thamy's minor daughters.

9.      Plaintiff Thamara B. Holt is a citizen of the United States and the spouse of Mr. Holt. Ms. Holt has resided in Riverton, Utah since May 2018.

10.      Plaintiff Derek Holt is Josh Holt's older brother. He is a U.S. citizen.  He was resident in the United States when Defendants' acts of terrorism caused him physical and emotional injuries.

11.      Plaintiff Anthony B. Jason Holt ("Jason Holt") is Joshua Holt's father. He is a U.S. citizen.  He was resident in the United States when Defendants' acts of terrorism caused him physical and emotional injuries.

12.      Plaintiff Katie Jill Holt is Joshua Holt's younger sister. She is a U.S. citizen.  She was resident in the United States when Defendants' acts of terrorism caused her physical and emotional injuries.

13.      Plaintiff Jenna Lee Nemeth née Holt is Joshua Holt's younger sister. She is a U.S. citizen.  She was resident in the United States when Defendants' acts of terrorism caused her physical and emotional injuries.

14.      Plaintiff M.L. is a minor, age 17, and is the daughter of Thamy Holt.

15.      Plaintiff N.C. is a minor, age 15, and is the daughter of Thamy Holt

16.      Plaintiff Carlos Marrón is a US citizen. He resides in Miami, Florida. He has lived lawfully in Miami continuously from May 11, 2011 through today, with the exception of the time when he was arbitrarily detained in Venezuela.

17.      Plaintiff Maria Alejandra Alfonzo was the spouse of Mr. Marrón until February 4, 2022, when she and Mr. Marrón divorced due to the strain that Defendants' acts of terrorism placed on their previously happy marriage. She is a citizen of the United States who resides in Miami,

Florida, where she has resided continuously since 2011, including during the time when Defendants' act of terrorism caused her physical and emotional injuries.

18.     Plaintiff Carlos Rafael Marrón is the son of Mr. Marrón and Ms. Alfonzo. He is 18 years old and is a citizen of the United States who resides in Miami, Florida, where he resided during the time when Defendants' act of terrorism caused him emotional injuries.

19.     Plaintiff S.A. is the minor daughter of Mr. Marrón and Ms. Alfonzo. She is 12 years old and is a citizen of the United States who resides in Miami, Florida, where she resided during the time when Defendants' act of terrorism caused her emotional injuries.

20.     Defendant PDVSA is a Venezuelan state-owned oil and natural gas company. On January 28, 2019, the US Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which implements U.S. sanctions, imposed sanctions on PDVSA.[1] In designating PDVSA, OFAC explained that "PdVSA has long been a vehicle for corruption" in Venezuela.

21.     Defendant Corporacion Venezolana del Petroleo ("CVP") is a wholly owned subsidiary of PDVSA. It manages, controls and/or owns businesses with third parties, both Venezuelan and non-Venezuelan, most typically joint ventures with non-Venezuelan oil companies.  Because CVP is wholly owned by PDVSA, it is also subject to U.S. sanctions and its assets are blocked in accordance with  OFAC regulations, except to the extent that OFAC creates an exception in the form of a general or specific license.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' federal ATA and RICO claims arise under the laws of the United States. This court has

---

[1] *See* Press Release, OFAC*, Treasury Sanctions Venezuela State-Owned Oil Company Petroleos de Venezuela, S.A.,* (Jan. 28, 2019).

supplemental jurisdiction over Plaintiffs' state-law claims because those claims arise from the same nucleus of operative facts, and are part of the same case or controversy under Article III of the United States Constitution, as Plaintiffs' federal ATA and RICO claims.  This Court also has subject-matter jurisdiction over Plaintiffs' ATA claims pursuant to 18 U.S.C. § 2338, which grants federal district courts exclusive jurisdiction over civil actions under 18 U.S.C. § 2333.

23.     Venue properly lies in this forum under 18 U.S.C. 2334(a), which provides that "[a]ny civil action under section 2333 of this title [the ATA] against any person may be instituted in the district court of the United States for any district where any plaintiff resides." All four of the Marrón Family plaintiffs reside in this judicial district.

24.     Venue properly lies in this forum under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district. Among other things, the Defendants used Florida as a base from which to provide unlawful material support to the terrorists who kidnapped, tortured, and falsely imprisoned Josh and Thamy Holt, and Carlos Marrón.   That support included providing Venezuelan terrorists with proceeds of narcotics trafficking, money laundering services, and bulk cash smuggling, all of which were committed in Florida and intended to harm U.S. citizens.

25.     The Court has personal jurisdiction over the Defendants under the Florida long-arm statute, Fla. Stat. § 48.193, and the Due Process Clause of the Fourteenth Amendment of the Constitution, because the Defendants personally and/or through their agents committed a tortious act within the State of Florida, giving rise to Plaintiffs' claims, including:

   a. Committing an act of terrorism in Florida by providing material support to terrorists (e.g., support to PDVSA, Maduro and the Cartel of the Suns) in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 2339C, in that PDVSA trafficked cocaine in

Florida intending that the monetary proceeds of cocaine sales be used for acts of terror that included the kidnapping, and torture of Joshua Holt, Thamy Holt, and Carlos Marrón; and

b. Committing an act of terrorism in Florida by providing material support to terrorists (e.g., support to PDVSA, Maduro, and the Cartel of the Suns) in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 2339C, in that Defendants laundered money in Florida, intending that the proceeds of said money laundering be used for acts of terror that included the kidnapping, and torture of Joshua Holt, Thamy Holt, and Carlos Marrón;

c. Conspiring to do each of the foregoing acts.

26. Defendants' torts against Plaintiffs were inextricably intertwined with, and a necessary and foreseeable component of, Defendants' trafficking of illegal drugs into and throughout South Florida, and/or their laundering money throughout South Florida, for their profit and gain.

27. This Court has personal jurisdiction over the Defendants under the Due Process Clause of the Fifth Amendment (as to federal claims) because Defendants' conduct relates to the United States and implicates important U.S. interests. *Fuld v. Palestinian Liberation Org.*, 145 S. Ct. 2090 (2025); *CC/Devas (Mauritius) Ltd. v. Antrix Corp.,* 605 U.S. 223, 145 S. Ct. 1572 (2025) (FSIA does not require independent "minimum contacts" analysis where an FSIA exception applies).

28. In the alternative, this Court has personal jurisdiction over the defendants under Fed. R. Civ. P. 4(k)(2) because the defendants (a) are not subject to jurisdiction in any state's courts of general jurisdiction and (b) exercising jurisdiction over the defendants in the United

States, including in this district, is consistent with the United States Constitution. Defendants themselves and/or through agents committed the following conduct in the United States, giving rise to Plaintiffs' claims:

a. Committing an act of terrorism in Florida by providing material support to terrorists (e.g., to PDVSA, Maduro and the Cartel of the Suns) in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 2339C, in that PDVSA trafficked cocaine in Florida intending that the monetary proceeds of their cocaine sales be used for acts of terror that included the kidnapping, and torture of Joshua Holt, Thamy Holt, and Carlos Marrón; and

b. Committing an act of terrorism in Florida by providing material support to terrorists (e.g., to PDVSA, Maduro, and the Cartel of the Suns) in violation of 18 U.S.C. § 2339A and 18 U.S.C. § 2339C, in that Defendants laundered money in Florida, intending that the proceeds of said money laundering be used for acts of terror that included the kidnapping, and torture of Joshua Holt, Thamy Holt, and Carlos Marrón;

c. Conspiring to do each of the foregoing acts.

29. This Court further may exercise personal jurisdiction to the maximum extent permitted by the Constitution over such claims based upon the other Florida and U.S. conduct of the Defendants alleged herein.

## THE FOREIGN SOVEREIGN IMMUNITIES ACT

30. Defendant CVP is not entitled to protections under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et sq*. Under 28 U.S.C. § 1603(b)(2), an entity qualifies as an "agency or instrumentality of a foreign state" only if "a majority of [its] shares or other

ownership interest is owned by a foreign state or political subdivision thereof." The Supreme Court

has definitively held that this requires **direct** ownership by the foreign state itself: "A corporation

is an instrumentality of a foreign state under the FSIA only if the foreign state itself owns a majority

of the corporation's shares." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003).  Because

CVP is owned by PDVSA, and not Venezuela itself, CVP is not protected by the FSIA.

31.     This Court may properly exercise jurisdiction over PDVSA pursuant to 28 U.S.C.

§ 1605B, under which PDVSA is not immune from suit.  Section 1605B provides:

> **(b) RESPONSIBILITY OF FOREIGN STATES.**—A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by—
>
> [1] an act of international terrorism in the United States; and
>
> [2] a tortious act or acts of [a] the foreign state, or [b] of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

32.     First, Plaintiffs "seek money damages . . . for physical injuries to person or property

occurring in the United States," including the following:

a. Laurie Holt—Plaintiff Joshua Holt's mother, who had no prior history of heart disease and was 50 years of age—suffered an enlarged heart and a fatal cardiac event on February 10, 2019, in Utah, as a direct and proximate physical injury caused by Defendants' acts of terrorism described herein.  Her death was an "injury occurring in the United States" within the meaning of 28 U.S.C. § 1605B(b);

b. Plaintiff Jason Holt, while residing in Utah—has suffered severe and ongoing mental and physical injuries. In the wake of his abduction and as a direct result of the abduction, while Mr. Holt was present in Utah, he developed hypertension,

gained substantial weight, and suffered severe gastroesophageal reflux and other gastrointestinal problems requiring treatment with omeprazole to manage symptoms and reduce the risk of ulcers.  He also suffers from chronic anxiety, persistent insomnia, impaired concentration, racing thoughts, emotional exhaustion, depression, and continuous mental distress. These conditions have required ongoing psychiatric care and prescription medications, including alprazolam (Xanax) for anxiety and zolpidem (Ambien) for sleep; despite medication, Plaintiff continues to experience significant sleep disturbance. The combined effects of chronic stress, anxiety, sleep disruption, and weight gain also contributed to the onset of diabetes mellitus that now requires pharmacologic management with metformin. These injuries were sustained in Utah and are a direct and proximate result of the wrongful conduct alleged in this Complaint.

c.  Plaintiff Derek Holt, while residing in Utah, suffered severe and chronic autonomic nervous system deregulation, causing a permanent physical alteration in his neurovascular pathway including panic attacks (accompanied by symptoms such as rapid heart rate, sweating, trembling, shortness of breath, dizziness) and depression. Mr. Holt's somatic anxiety manifested physically through recurrent, unprovoked cardiovascular panic episodes, during which Plaintiff suffered acute, measurable physical symptoms including severe tachycardia and profound hyperventilation resulting in physical hypoxia. These physical episodes were accompanied by severe neurological tremors, involuntary muscle fasciculations, as well as PTSD. These injuries were sustained in Utah and are a direct and proximate result of the wrongful conduct alleged in this Complaint.

11

d. Plaintiff Jenna Nemeth, while residing in Utah, developed severe, acute, and measurable physiological trauma to her cutaneous and nervous systems manifested as an aggressive, physical outbreak of acute neurogenic urticaria and severe dermatitis, characterized by raised, erythematous, pruritic welts, and widespread edematous wheals or hives on multiple areas of her body.  She also suffered extensive epidermal excoriation, skin tearing, and permanent cutaneous scarring. These injuries were sustained in Utah and are a direct and proximate result of the wrongful conduct alleged in this Complaint.

e. Plaintiff Katie Holt, while residing in Utah, suffered physical injury to her central nervous system and circadian biological pathways, which included trauma impairing Plaintiff's natural sleep-wake architecture, causing a toxic disruption in the physical production of melatonin and serotonin within the pineal gland.  This neurochemical defect manifests as severe, chronic somatic insomnia, which physically deprives Plaintiff's brain and body of essential rapid eye movement (REM) and deep-stage slow-wave sleep.  Additionally, structural alterations in Plaintiff's brain chemistry, including the downregulation of neurotransmitter receptors and localized neurochemical atrophy, with somatic manifestations, led to a severe breakdown of Plaintiff's gastrointestinal and metabolic systems.  These injuries were sustained in Utah and are a direct and proximate result of the wrongful conduct alleged in this Complaint.

f. Plaintiff Maria Alejandra Alfonzo, while residing in Miami, Florida, developed (and continues to suffer from) Raynaud's syndrome—an organic vascular disease causing recurrent painful constriction of the blood vessels in her hands and feet—

12

and recurrent outbreaks of carbuncles, a deep dermal bacterial infection causing painful, pus-filled clusters of boils that leave permanent scarring.  Both Raynaud's syndrome and carbuncles are physical conditions with organic pathology, not mere physical manifestations of emotional distress.  Both arose in Florida and continue to cause her physical injury in Florida.  These injuries were sustained in Florida and are a direct and proximate result of the wrongful conduct alleged in this Complaint.

g.  Additionally, the Marrons suffered property loss in Florida including but not limited to, the draining of bank accounts located in Miami, Florida including Wells Fargo Bank account ******9278, and Bank of America account  ******2188, and crypto transactions through Coinbase.  Furthermore, as described below in more details, Defendants' agents extorted from Maria Alejandra, while she was in Florida, over $150,000 in payments under the threat that they would inflict grievous injuries on her husband (Carlos Marrón) unless she made those payments.

33.    Second, as described herein, Plaintiffs' injuries were caused by acts of international terrorism in the United States, including Defendants' narcoterrorism that occurred in the United States and was aimed at injuring the U.S. populace, as well as the provision of material support to terrorists, such as laundering terrorist assets to, through and from the United States and channeling funds from the United States into the coffers of terrorists abroad.

34.    Third, as described above, Plaintiffs' injuries were caused by the tortious acts of PDVSA, which is a foreign state for purposes of Section 1605B(b)(2).

35.    In the alternative, Plaintiffs' injuries were also caused by employees or agents of PDVSA, who were acting within the scope of their office or employment, having been appointed by Maduro to engage in the type of terrorist activities that harmed Plaintiffs.  This also

independently satisfies Section 1605B(b)(2).

36.     In addition, the Court has jurisdiction over PDVSA under the Commercial Activities exception to the FSIA. Under the commercial-activity exception, "[a] foreign state [including its instrumentalities] shall not be immune from the jurisdiction of courts of the United States or of the States in any case":

> in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

37.     For purposes of the commercial activities exception, narcotics trafficking and money laundering are commercial activities. The FSIA defines commercial activity as "a regular course of commercial conduct," and specifies that "[t]he commercial activity shall be determined by reference to the nature or course of conduct . . . rather than by reference to its purpose." 28 U.S.C. § 1603(d). Thus, the question is "whether the particular actions that the foreign state performs (whatever the motive behind them) are of the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992); *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1222 (11th Cir. 2018).

38.     Here, PDVSA's conduct was not the type of conduct in which only foreign sovereigns engage, in their sovereign capacity; rather, PDVSA did what private (albeit criminal) actors routinely do:  participated in narcoterrorist sales of cocaine, laundered ill-gotten proceeds of unlawful activity including drug trafficking, currency scams and oil-related theft and graft on behalf of terrorists, and utilized the money to support terrorists. Such conduct is "commercial

activity" for FSIA purposes.

39.     In light of PDVSA's commercial activity, the third clause of the commercial activities exception is satisfied.

40.     The kidnapping and torture of Joshua Holt, Thamy Holt, and Carlos Marrón in Venezuela are each an "[1] act outside the territory of the United States [2] in connection with commercial activity of the foreign state [3] elsewhere."  That is, (1) the kidnappings, torture and arbitrary detention occurred outside the United States, (2) as shown above, the kidnappings, torture and arbitrary detention occurred "in connection with" PDVSA's commercial activity, e.g., PDVSA's trafficking of narcotics and laundering of narcotics proceeds, PDVSA provision of air transportation services, and (3) PDVSA's commercial activity, i.e., its trafficking of narcotics and laundering of narcotics proceeds, its provision of air transportation, occurred  "elsewhere" from United States.

41.     Further, the commercial activity (money laundering, narcotics trafficking, air transportation) caused direct effects in the United States.  A "direct effect" is "one that follows 'as an immediate consequence of the defendant's . . . activity.'"  *Devengoechea*, 889 F.3d at 1224 (quoting *Weltover*, 504 U.S. at 618) (ellipses in original). In other words, the court assesses whether the effect was sufficiently direct that "Congress would have wanted an American court to hear the case." *Id.* (quoting *Guevara v. Republic of Peru,* 608 F.3d 1297, 1309 (11th Cir. 2010)). The direct-effect test is satisfied where, for example, where defendant's money laundering abroad causes a U.S. financial institution to be involved (often unwittingly) in processing money laundering transactions. *Id.* (third clause satisfied where defendant's "activities outside the United States led to approximately $1 billion being laundered through the U.S. financial system"); *see also Aldy v. Valmet Paper Machinery*, 74 F.3d 72, 74-76 (5th Cir. 1996) (direct-effect requirement

satisfied where injuries suffered in the United States in connection with Finnish state-owned company's design and manufacture of defective product in Finland).

42. There were numerous direct effects of PDVSA's commercial activity in the United States, including that PDVSA's money laundering caused U.S. financial institutions to participate in Defendants' money laundering transactions and PDVSA's narcotrafficking caused U.S. persons to participate in buying, selling and using cocaine in the United States.

43. And this is precisely the type of case that Congress would have wanted a U.S. court to hear, in which the U.S. domestic marketplace was leveraged to fund terrorism against U.S. citizens, and in which terrorists ensconced overseas directly plied their trade against citizens in the United States.

44. The first clause of the commercial activities exception is also satisfied.

45. To begin, PDVSA engaged in commercial activity, including narcotic trafficking and money laundering, in the United States.

46. Further, Plaintiffs' legal action is "based upon" PDVSA's commercial activity in the United States, through which PDVSA provided material support—in violation of the ATA— to the terrorist who kidnapped and tortured Plaintiffs. To identify the conduct upon which the Plaintiffs' action is based, the court looks at "the particular gravamen of the suit." *Devengoechea*, 889 F.3d at 1222. In other words, the court focuses on the "core of the suit—the ***foreign state's acts*** that actually injured the Plaintiffs." *Id.* (emphasis added).

47. Here, the gravamen of Plaintiffs' suit centers on PDVSA's provision of support for terrorists, *i.e.*, its U.S. conduct. The PDVSA "acts that actually injured Plaintiffs" were its narcoterrorism in the United States and its financial support for terrorism originating in this country, including but not limited to U.S.-based money laundering, narcotrafficking, bulk cash

smuggling, and stealing the funds from the Marrón's Miami bank accounts, among others.  These

U.S. elements, if proven, give rise to relief.

**FACTUAL ALLEGATIONS**

I.     **PDVSA'S TERRORISM AGAINST U.S. CITIZENS, INCLUDING THE PLAINTIFFS.**

A.     **PDVSA Has Utilized Its Airplanes In The Kidnapping of US Citizens**

48.     PDVSA, directly and through wholly owned subsidiaries answerable to it, owns and/or controls a large fleet of commercial aircraft.  At all relevant times, PDVSA regularly utilized those aircraft to  commit acts of terrorism against U.S. citizens, including to shuttle kidnapping victims to and/or from unlawful detention in Venezuela.

49.     For example, in November 2017, PDVSA issued an order that unexpectedly and urgently directed five U.S. citizens and one permanent resident—all top executives of the Houston-based oil company Citgo, which was at the time a wholly owned subsidiary of PDVSA—to fly from the United States to Caracas on a Citgo jet.  PDVSA lured the executives (known as the "Citgo 6") to Caracas based on the pretext that they were being summoned to Caracas for official PDVSA business, when in fact PDVSA knew that they would be kidnapped upon their arrival.  Indeed, the Citgo 6 were attending a PDVSA "meeting" when Maduro arrested them.  Maduro arbitrarily detained the Citgo 6 for nearly five years.

50.     The U.S. government and human rights organizations characterized the detention of the Citgo 6 as "hostage diplomacy," because Maduro used the Citgo 6 as political pawns to gain leverage over Washington.  Maduro held the Citgo 6 in the notorious El Helicoide prison and in the basement of the military intelligence headquarters ("DGCIM"), often in windowless cells with limited access to food, light, or medical care.  Ultimately, the United States obtained the release of the Citgo 6 by swapping them for two of Maduro's relatives (the "Narco Nephews") who were serving time in U.S. federal prison for drug trafficking.  PDVSA supplied a plane from its own

fleet to whisk the Citgo 6 from Caracas to the prisoner exchange where they were swapped for the Narco Nephews.

51.     Similarly, in June 2020, the United States captured and arrested one of Maduro's key insiders—Alex Nain Saab Moran ("Alex Saab")—and held him in federal prison in Miami pending his trial for conspiracy to commit money laundering.  Maduro responded with aggressive acts of anti-American terrorism, kidnapping U.S. citizens to trade for Alex Saab's release.  In 2023, in return for Alex Saab's release, Maduro freed 10 Americans and several Venezuelan political prisoners.  PDVSA once again supplied a plane from its fleet to carry Americans from Caracas to the prisoner exchange.  The hostages' heads were covered with hoods during the flight, blinding them.  PDVSA's plane flew them to an airstrip in the Caribbean island nation of St. Vincent and the Grenadines, where the captives were transferred back to the United States.

**B.     PDVSA Utilizes Its Airplanes For Narcoterrorism That Harms US Citizens and Funds Venezuelan Terrorists**

52.     PDVSA also has utilized its airplanes to engage in narcoterrorism designed to simultaneously harm the U.S. populace and to fund Venezuelan terrorists, including funding, among others, PDVSA itself, Maduro, and the Cartel of the Suns.

53.     As scholars have explained, "[d]rug trafficking can exist for purposes other than profit. That is especially true when we consider Venezuela's Bolivarian Revolution that from the outset was dedicated to the development and deployment of illicit drugs for the purpose of asymmetrical warfare against the United States."[2] Indeed, the concept of using "drugs as a weapon is an idea originated by [former Cuban President] Fidel Castro, to intoxicate the American people,"

---

[2] *Weaponized Drug Trafficking: How Venezuela Built a Super Cartel to Attack the United States*, Center for a Secure Free Society, (Sept. 22, 2022), https://www.securefreesociety.org/research/weaponized-drug-trafficking/.

according to Luis Fleischman, a sociology professor at Palm Beach State University in Florida.[3]

"The harm that is done by a ton of cocaine is almost incalculable. The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering."[4]

54.     On March 26, 2020, the DOJ unsealed indictments charging myriad crimes against Maduro and other Venezuelan leaders for narcotics trafficking and narcoterrorism. Summing up the charges, then-U.S. Attorney General William P. Barr explained that "[t]he Venezuelan regime, once led by Nicolás Maduro Moros, remains plagued by criminality and corruption. . . . For more than 20 years, Maduro and a number of high-ranking colleagues . . . caus[ed] tons of cocaine to enter and devastate American communities."[5]

55.     Geoffrey S. Berman, who then was the United States Attorney for the Southern District of New York, further explained how Maduro—through corrupt Venezuelan institutions—engaged in narcoterrorism specifically aimed at injuring U.S. citizens:

> Today we announce criminal charges against Nicolás Maduro Moros for running, together with his top lieutenants, a ***narco-terrorism*** partnership with the FARC for the past 20 years. . . The scope and magnitude of the drug trafficking alleged was made possible only because Maduro and others ***corrupted the institutions of***

---

[3] *Venezuela Built Drug 'Super Cartel' to Attack US, Think Tank Says*, Dialogo Americas, (Apr. 3, 2023), https://dialogo-americas.com/articles/venezuela-built-drug-super-cartel-to-attack-the-us-think-tank-says/.

[4] *United States v. Pelagio Suarez,* 16-cr-453 (S.D.N.Y.), Dkt. No. 160, Tr. 27.

[5] *See* DOJ Press Release, *supra* n. 6, ¶ 1; Julieta Pelcastre, *Investigation Lays Out Deep Involvement of Maduro in Drug Trade*, Dialogo Americas, (Dec. 20, 2023) ("The management of cocaine trafficking in Venezuela is not something new," Euclides Tapia, a senior lecturer in International Relations at the University of Panama, told *Diálogo* on November 26. "Since Maduro took control, he has been identified as the main person responsible for this illegal and money-laundering mechanism."); https://dialogo-americas.com/articles/investigation-lays-out-deep-involvement-of-maduro-regime-in-drug-trade/; *Venezuela Built Drug Super Cartel to attack the US, Think Tank Says,* Dialogo Americas, (Apr. 3, 2023) ("Drug trafficking can exist for purposes other than profit," the report indicates. "That is especially true when we consider Venezuela's Bolivarian Revolution that from the onset was dedicated to the development and deployment of illicit drugs for purposes of asymmetric warfare against the United States."), https://dialogo-americas.com/articles/venezuela-built-drug-super-cartel-to-attack-the-us-think-tank-says/.

*Venezuela* and provided political and military protection for the rampant narco-terrorism crimes described in our charges. As alleged, Maduro and the other defendants *expressly intended to flood the United States with cocaine in order to undermine the health and wellbeing of our nation*. Maduro very deliberately deployed cocaine as a weapon. While Maduro and other cartel members held lofty titles in Venezuela's political and military leadership, the conduct described in the Indictment wasn't statecraft or service to the Venezuelan people. As alleged, the defendants betrayed the Venezuelan people and corrupted Venezuelan institutions to line their pockets with drug money.[6]

56.     PDVSA was among the corrupt Venezuelan institutions that engaged in a pattern and practice of narcoterrorism directed against the United States, utilizing its own aircraft to smuggle cocaine for the Cartel and Maduro.[7] "In January 2015, a senior Venezuelan security official defected to the United States to cooperate with U.S. authorities. The official explained that PDVSA has been using its own aircraft to move drug shipments across international borders."[8]

57.     An April 2019 Report prepared by the Foundation for Human Rights in Cuba explains "several federal agencies are keeping open a criminal investigation into a drug-trafficking

---

[6] *See* DOJ Press Release, Dep't of Justice, *Nicolás Maduro Moros and 14 Current and Former Venezuelan Officials Charged with Narco-Terrorism, Corruption, Drug Trafficking and Other Criminal Charges* (Mar. 26, 2020), https://www.justice.gov/opa/pr/nicol-s-maduro-moros-and-14-current-and-former-venezuelan-officials-charged-narco-terrorism#:~:text=Berman.,crimes%20described%20in%20our%20charges (emphasis added).

[7] *Top Venezuela Govt Official Accused of Drug Trafficking* (Jan. 27, 2015), Insight Crime, *available at* https://insightcrime.org/news/brief/top-venezuela-govt-official-accused-of-drug-trafficking/ ("Venezuelan state oil firm PDVSA's airplanes were sometimes used to transport drugs, with proceeds laundered through the company.").

[8] *DOJ Puts Companies With Venezuelan Ties In Its Crosshairs*, Law360 (Mar. 7, 2016), *available at* https://www.law360.com/articles/767389/doj-puts-companies-with-venezuelan-ties-in-its-crosshairs; *see also* Peter Binose, *Mount Coke, or a Mountain of Coke,* iNews (Nov. 21, 2016) ("Apparently Venezuelan government owned aircraft and that includes those belonging to the oil company PDVSA [they have a local office in Kingstown] are never searched."), *available at* https://www.ieyenews.com/peter-binose-mount-coke-or-a-mountain-of-cocaine-ask-ralph/.

and money-laundering network through which dozens of tons of cocaine are shipped weekly in at least five planes registered in the name of PDVSA."[9]

58.     An unsealed 2026 indictment of Maduro further explains how PDVSA planes were used to traffic cocaine under the direct supervision of Maduro's own son:

> Between approximately 2014 and 2015, a captain in the Venezuelan National Guard on Margarita Island, Venezuela, coordinated hotels, transportation, women, and food for visits by Venezuelan officials, including [Maduro's son], a/k/a "Nicolasito," a/k/a "The Prince," . . . who visited Margarita Island approximately twice monthly. [Nicolasito] would arrive on a Falcon 900 plane owned by Venezuela's state oil company, Petroleos de Venezuela, S.A. ("PDVSA"). Before leaving the island, [Nicolasito's] PDVSA plane would be loaded, sometimes with the assistance of armed sergeants, with large packages wrapped in tape that the captain understood were drugs. [Nicolasito] was present while the PDVSA plane was loaded and, on one occasion, stated that the plane could go wherever it wanted, including the United States.

59.     Consistent with PDVSA's direct involvement in narcotrafficking, Tarek El Aissami—a senior leader to the Cartel of the Suns—served as Venezuela's Minister of Petroleum for a number of years.  As such, from 2020 to 2023, El Aissami held ultimate executive authority over PDVSA, orchestrating its massive black-market oil sales, and personally profiting from PDVSA corruption.  Before El Aissami was handed the keys to Venezuela's oil industry, the U.S. Treasury sanctioned El Aissami in 2017 as a Specially Designated Narcotics Trafficker.[10]  In 2019, the DOJ indicted him for violating the Kingpin Act.[11]

---

[9] Juan Antonio Blanco, Rolando Cartaya, Luís Domínguez, and Casto Ocando, *Cubazuela: Chronical of a Cuban Intervention*, Foundation for Human Rights in Cuba (April 2019), at 90-91 available at https://www.fhrcuba.org/wp-content/uploads/2019/04/CUBAZUELA-CUBAN-INTERVENTION-English.pdf.

[10] Press Release, Treasury, Treasury Sanctions Prominent Venezuelan Drug Trafficker Tareck El Aissami and His Primary Frontman Samark Lopez Bello (Feb. 13, 2017), available at https://home.treasury.gov/news/press-releases/as0005.

[11] *United States v. El Aissami*, 19-cv-144 (S.D.N.Y), Superseding Indictment ("El Aissami Indictment"), https://www.justice.gov/opa/page/file/1261556/dl?inline.

60.     The ill-gotten proceeds of PDVSA's narcotrafficking flow directly into the coffers of Venezuelan terrorists, including PDVSA itself, Maduro, and the Cartel of the Suns.  Given the woeful economic conditions in Venezuela under Maduro's leadership, Maduro could not have continued to exert dictatorial control over Venezuela (prior to his capture in January 2026), nor continued to engage in acts of terrorism against U.S. citizens, were it not for the inflow of narcotics and other criminal proceeds, which Maduro doled out to his cronies and loyalists to purchase their continued fealty.

**C.     PDVSA Utilizes Its Airplanes To Smuggle Cash To Fund Crime In the United States**

61.     PDVSA also utilized at least one of its planes to support bulk cash smuggling operations, with the specific purpose of funding violence and crime in the United States.

62.     Starting in October 2018, thousands of migrants gathered and traveled from Central America through Mexico to seek entry to the United States. This came to be known as the "migrant caravan."  U.S. Customs and Border Protection ("CBP") feared that the estimated 7,000 to 10,000 members of the migrant caravan could overwhelm CBP's resources and hinder its ability to process the ordinary flow of trade and travel. Additionally, because of reports that the migrant caravan entered Mexico by force, CBP was concerned about the potential for mass illegal border crossings and violence against law enforcement when the migrant caravan reached the U.S. border.

63.     Maduro exacerbated these dangers by using ill-gotten and/or misappropriated PDVSA assets to encourage additional migrants to join the caravan. To support those efforts, PDVSA supplied an airplane and stuffed it with $500,000 in U.S. dollars in bulk cash. PDVSA then sent the plane to the United States, with the intent of utilizing the cash to further its agenda of increasing the harm the migrant caravan might cause at the U.S. border.

23

64.     On or about October 18, 2018, the PDVSA plane with the cash landed at Fort Lauderdale-Hollywood International Airport. The United States intercepted the aircraft when it landed and impounded it at the airport, where it still remains.

**D.      PDVSA Launders Money To, From, and Through the United States To Support Venezuelan Terrorists**

65.     Shortly after Maduro's ascent to power, PDVSA "becam[e] a massive industrial money launderer at the service of narcotrafficking."[12] "US authorities have gathered documents and eyewitness testimonies implicating officers of the state-run oil company, Petróleos de Venezuela S.A. (PDVSA), in engaging in transactions and money laundering on behalf of cocaine smugglers within the government."[13] A source familiar with the U.S. investigation into the PDVSA money laundering told the Miami Herald that "everything runs through him [Maduro]."[14]

---

[12] *See* Angus Berwick and Matt Spetalnick, *U.S. Takes Aim at the Power Behind Venezuela's Maduro: His First Lady*, Reuters (May 27, 2020).

[13] Roger F. Noriega, *Venezuela: Rise of a Narcostate*, AEI (Aug. 11, 2015), https://www.aei.org/foreign-and-defense-policy/latin-america/venezuela-rise-of-a-narcostate/; Douglas Farah, *The Maduro Regime's Illicit Activities: A Threat to Democracy in Venezuela and Security in Latin America*, Atlantic Council at 2 (Aug. 13, 2020), https://www.atlanticcouncil.org/wp-content/uploads/2020/08/The-Maduro-Regime-Illicit-Activities-A-Threat-to-Democracy-in-Venezuela-and-Security-in-Latin-America-Final.pdf (PDVSA family "launder[s] billions of dollars in illicit proceeds from the sales of cocaine, gold, and other commodities."); *The Network of Accomplices of "Narco-General" Carvajal and PDVSA's Role in Laundering*, infobae (July 25, 2014), https://www.infobae.com/2014/07/25/1583136-la-red-complices-del-narcogeneral-carvajal-y-el-papel-pdvsa-el-lavado/ (Venezuelan Colonel Julio Rodríguez Salas explained how Cartel of the Suns leader General Hugo Carvajal Barrios described the drug trafficking network and how Carvajal was key in the mechanism that allowed billions of dollars from drug sales to be laundered through PDVSA); *see also* Ricardo Guanipa D'Eizans, *PDVSA: A Major Money Laundering Operation*, Dialogo Americas (Aug. 3, 2019) ("The DEA began to suspect that the Venezuelan oil company was also being used to launder profits from narcotrafficking."), https://dialogo-americas.com/articles/pdvsa-a-major-money-laundering-operation/.

[14] Jay Weaver and Antonio Maria Delgado, *Venezuela's Maduro under investigation in $1.2 billion U.S. money-laundering case*, Miami Herald (July 30, 2018).

66.     "Using PDVSA as the primary laundering vehicle," Maduro "moved money through PDVSA coffers using programs like 'oil exchanges,' fictitious massive infrastructure projects, from companies and sophisticated offshore financial structures . . . to launder billions of dollars in illicit proceeds."[15]

67.     PDVSA has laundered the proceeds of Maduro and the Cartel's drug running through the United States, especially South Florida. "As I drive from my house in Miami to the U.S. Attorney's Office in downtown Miami, I can literally see the fraud and corruption of Maduro's regime — from multimillion-dollar condos on Fisher Island owned by corrupt Venezuelan executives and generals, to luxury yachts on Biscayne Bay and private jets owned by Venezuelan officials," U.S. Attorney Ariana Fajardo Orshan said.[16]

68.     The Foundation for Human Rights in Cuba elaborates:

According to witnesses who are currently protected by the U.S. government, Cuba received up to 30 percent of the cash amounts brought in from Venezuela [on PDVSA airplanes], in exchange for making transfers to bank accounts in the United States, in order to legitimize the money earned from drug trafficking.[17]

69.     The American Enterprise Institute explains: "Venezuela's rampant corruption and money laundering schemes are integral elements of international narcotics trafficking operations. . . . Testaferros (front men) outside the government work with officials to launder cocaine profits by," among other things, "purchasing convertible US-dollar-denominated PDVSA bonds with

---

[15] Douglas Farah, *The Maduro Regime's Illicit Activities: A Threat to Democracy in Venezuela and Security in Latin America*).

[16] Jay Weaver and Antonio Maria Delgado*, Miami Feds Seize $450 Million — Cash, Condos, Horses — in Venezuelan Corruption Cases*, Diazreus*,* (Apr. 27, 2020), https://diazreus.com/miami-feds-seize-450-million-cash-condos-horses-in-venezuelan-corruption-cases/.

[17] *Cubazuela: Chronical of Cuba Intervention*, *supra* n. 86, at 90.

local currency. . . . Much of these assets are either in the United States or in dollar denominated accounts."

70. PDVSA, at its peak in the early 2000s, moved more than $100 billion a year in legitimate oil sales. The volume of money that PDVSA moved around the world for lawful purposes led Maduro and the Cartel to use PDVSA as the key hub of their multi-billion dollar money laundering system. Because PDVSA was engaging in transactions in petrodollars, its money laundering transactions cleared through the United States.

71. As PDVSA's role in money laundering for the Cartel expanded, the Cartel—working hand-in-glove with PDVSA—became a one-stop-shop for narcotics traffickers throughout the region. Narcotics traffickers not only could purchase cocaine from the Cartel, they also could launder their ill-gotten gains through PDVSA, with PDVSA and the Cartel reaping additional profits for these money-laundering services.

72. Because PDVSA had the backing of Maduro, and was cloaked in the (false) appearance of being a legitimate governmental enterprise, PDVSA was able to offer the Cartel and other regional narcotics traffickers stability and certainty, creating a favorable climate for unlawful business and making its services highly desirable to narcotics traffickers.

73. PDVSA's money laundering on behalf of Venezuelan terrorists is not limited to proceeds from narcotic trafficking. One of Maduro's most profitable schemes for siphoning funds from the Venezuelan treasury into the pockets of his chosen insiders has been a currency conversion scam that takes advantage of the strict currency controls that Maduro imposed on Venezuela's official currency, the bolívar.

74. The basics of the scheme, in its simplest form, are straightforward: Maduro's cronies bought U.S. dollars on the official Venezuelan government exchange (which offered US

dollars at a steep discount against the bolívar, and was accessible only to those select persons who enjoyed the Maduro Regime's favor). Then, Maduro's cronies resold the U.S. dollars on Venezuela's black market at a hefty profit.

75.     In a somewhat more sophisticated version of the same type of scheme, Maduro's network started with U.S. dollars and used them to purchase "bolivares on the black market. They then gave a loan to Venezuela's state-owned oil company—Petróleos de Venezuela, S.A. ('PDVSA')—in bolivares, but PDVSA paid them back in dollars at the official exchange rate, which resulted in them having many more dollars than what they started out with. This allowed the group to increase their initial investment tenfold. The operation began in December of 2014, and was meant to embezzle $600 million (about €534 million). By May 2015, the group had been able to double the amount to $1.2 billion (€1.07 billion)."[18]

76.     PDVSA then laundered the proceeds of such currency conversion schemes through the United States. The DOJ has explained, for example, that a former Swiss banker (who pleaded guilty to conspiracy to commit money laundering) "and members of the [Venezuelan] money laundering conspiracy used Miami, Florida real estate and sophisticated false-investment schemes to conceal that the $1.2 billion was in fact embezzled [through currency scams] from PDVSA."[19]

77.     Indeed, because much of the PDVSA money laundering of these currency control scam proceeds occurred in Florida, the United States has indicted for money laundering in this judicial district PDVSA executives and associates, including Abraham Edgardo Ortega, PDVSA's

---

[18] *See* How Millions of Dirty Dollars were Laundered out of Venezuela, DW, available at https://www.dw.com/en/how-millions-of-dirty-dollars-were-laundered-out-of-venezuela/a-47867313.

[19] Press Release, DOJ, Former Swiss Bank Executive Sentenced to Prison for Role in Billion-Dollar International Money Laundering Scheme Involving Funds Embezzled from Venezuelan State-Owned Oil Company (Oct. 29, 2018), available at https://www.justice.gov/opa/pr/former-swiss-bank-executive-sentenced-prison-role-billion-dollar-international-money.

former Executive Director of Financial Planning, who pleaded guilty and served more than three years in federal prison.[20]

78.     The affidavit from a Homeland Security investigator in the case against Ortega affirms that, from the money obtained through the PDVSA currency control scam, €159,085,876.26 went to "CHAMOS,"[21] *i.e.,* the stepsons of Maduro.[22]

79.     Leaked documents show that leading U.S. banks reported more than $4.8 billion in suspicious transactions with links to Venezuela between 2009 and 2017. Nearly 70% of those transactions involved public money from PDVSA or the Venezuelan Ministry of Finance.[23]

E.     **PDVSA Shared Maduro's Anti-American Terrorist Objectives**

---

[20] *See* Press Release, DOJ, Former Executive Director at Venezuela State-Owned Oil Company, Petroleos De Venezuela, S.A., Pleads Guilty to Role in Billion-Dollar Money Laundering Conspiracy (Oct. 31, 2018), available at https://www.justice.gov/opa/pr/former-executive-director-venezuelan-state-owned-oil-company-petroleos-de-venezuela-sa-pleads ("Abraham Edgardo Ortega, a Venezuelan national who was PDVSA's executive director of financial planning, pled guilty to one count of conspiracy to commit money laundering for his role in the billion-dollar international scheme to launder funds embezzled from PdVSA."); *see also* Criminal Complaint (ECF No. 3), *U.S. v. Guruceaga*, Case No. 1:18-cr-20685 (S.D. Fla.), (Affidavit of Special Agent of Homeland Security Investigations George F. Fernandez) at ¶ 18 ("Two years and over one hundred recordings later [our investigation] revealed an international conspiracy to launder the PDVSA funds through Miami and several large-scale, international third-party money-laundering organizations. More specifically, the investigation revealed the use of Miami real estate and sophisticated false-investment schemes to launder hundreds of millions of U.S. Dollars.").

[21] *See U.S. v. Guruceaga*, Case No. 1:18-cr-20685 (S.D. Fla.), (Affidavit of Special Agent of Homeland Security Investigations George F. Fernandez) at ¶ 109(b); *see* Factual Proffer (ECF No. 30), *U.S. v. Krull*, Case No. 1:18-cr-20682 (S.D. Fla), at ¶ 19(a) ("[A]pproximately 159 million Euros [from the PDVSA currency control scam was routed] to three individuals known as 'Los Chamos,' the stepson of 'Venezuela Official 2' [Maduro][.]").

[22] *See* Joshua Goodman, *Maduro's Stepsons Face Scrutiny in $1.2 Billion Graft Case*, AP News (Aug. 24, 2018) ("Los Chamos actually are Yoswal, Yosser and Walter Flores, the children of First Lady Cilia Flores from a previous relationship and thus Maduro's stepsons.").

[23] *See* Sasha Chavkin and Patricia Marcano, *How Banks Helped Venezuela's "Boligarchs" Extract Billions*, International Consortium of Investigative Journalists (Sept. 21, 2020), https://www.icij.org/investigations/fincen-files/how-banks-helped-venezuelas-boligarchs-extract-billions/.

28

80.     In 2014, Maduro appointed Carlos Erik Malpica Flores ("Malpica")—the nephew of Venezuela's First Lady—as the Vice President of Finance of PDVSA.[24] Through this act of nepotism, Maduro—and his inner circle, including his wife, First Lady Flores, whom OFAC sanctioned for her support of Maduro's corruption[25]—expanded their personal control over PDVSA. As one Venezuela expert has explained, at the time, "President [Maduro] and his inner circle directly control[ed] PDVSA."[26]

81.     Efrain Campo Flores, a nephew to First Lady Flores who was convicted of smuggling cocaine into the United States, explained in a private text message later acquired by U.S. investigators that Malpica was "the maximum authority there [i.e., PDVSA] since he's a Flores."[27] Efrain Campo Flores further explained that Malpica could help one of Efrain Campo Flores's friends collect a debt from PDVSA, although Malpica "will not do it for free."[28] In 2017, OFAC imposed sanctions on Malpica for his role in corruption at PDVSA.[29]

---

[24] *See* Angus Berwick and Matt Spetalnick, *U.S. Takes Aim at the Power Behind Venezuela's Maduro: His First Lady*, Reuters (May 27, 2020) ("In 2014, PDVSA appointed a new finance director: Carlos Malpica, the third nephew of [First Lady Cilia] Flores . . . . People close to Flores said Malpica had become the first lady's most trusted relative, especially when it came to financial matters.").

[25] *See* Exhibit 32, Press Release, OFAC, Treasury Targets Venezuela President Maduro's Inner Circle and Proceeds of Corruption in the United States (Sept. 25, 2018), available at https://home.treasury.gov/news/press-releases/sm495 (sanctioning Maduro's wife as one of his inner circle, and explaining that "Maduro relies on his inner circle to maintain his grip on power, as his regime systematically plunders what remains of Venezuela's wealth").

[26] Douglas Farah, *Convergence in Criminalized States: The New Paradigm, in* Beyond Convergence: World Without Order (Oct. 2016).

[27] *U.S. Takes Aim at the Power Behind Venezuela's Maduro: His First Lady), supra* n. 77.

[28] *Id.*

[29] *See* Exhibit 34, Press Release, OFAC Sanctions 13 Current and Former Senior Officials of the Government of Venezuela (July 26, 2017), available at https://home.treasury.gov/news/press-releases/sm0132.

29

82.     In March 2021, the United States Executive Branch advised U.S. courts that "[Nicolas] Maduro remains in power in Venezuela, and in control of PDVSA.'"[30]

83.     As a federal court in Delaware explained, prior to the U.S. capture of Maduro, the facts on the ground in Venezuela were that, "[d]espite its non-recognition by the U.S. government, the Maduro Regime continues (1) to exercise *de facto* control . . . over PDVSA and its assets and operations in Venezuela" and (2) to "use PDVSA as its *primary conduit for corruption*." *OI Eur. Grp. B.V. v. Bolivarian Republic of Ven.*, 663 F. Supp. 3d 406, 425 (D. Del. 2023), *aff'd*, 73 F.4th 157 (3d Cir. 2023) (emphasis added).

**F.      OFAC's Designation of PDVSA.**

84.     On January 28, 2019, OFAC responded to the ongoing corruption and abuse at PDVSA by sanctioning the company under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.* and Executive Order 13850. *See* 84 Fed. Reg. 3282. OFAC explained that it sanctioned PDVSA to "help prevent further diverting of Venezuela's assets by Maduro."[31] OFAC stated that the "illegitimate Maduro regime has continued to use [PDVSA] as its primary conduit for corruption." *OI European Group, B.V. v. Venezuela*, 663 F. Supp. 3d 406, 425 (D. Del. 2023)

---

[30] Exhibit 35, Trial Brief (ECF No. 80), *U.S. v. De Jongh Atencio*, Case No. 4:20-cr-00305 (S.D. Tex.), at 8.

[31] *See* Press Release, OFAC*, Treasury Sanctions Venezuela State-Owned Oil Company Petroleos de Venezuela, S.A.,* (Jan. 28, 2019), https://www.justice.gov/usao-sdny/pr/former-venezuelan-official-hugo-armando-carvajal-barrios-extradited-united-states.

85. A few months later, on August 5, 2019, the President through Executive Order 13884 ("E.O. 13884") blocked "all property and interest in property of the Government of Venezuela."[32] Under E.O. 13884, the term "Government of Venezuela" includes:

> [T]he state and Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de Venezuela, S.A. (PdVSA), any person owned or controlled, directly or indirectly, by the foregoing, and any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, including as a member of the Maduro regime.[33]

86. The decision to block PDVSA's assets, as explained in President Trump's Executive Order, was made "in light of the continued usurpation of power by Nicolas Maduro and persons affiliated with him, as well as human rights abuses," *id.*, which is precisely what Plaintiffs here suffered.

87. Following the capture of Nicolás Maduro by the United States on January 3, 2026, OFAC has issued several General Licenses to facilitate the re-entry of U.S. companies into the Venezuelan energy sector, including allowing U.S. companies to transact with PDVSA in certain circumstances.

88. The United States has not, however, removed PDVSA from the OFAC list of sanctioned parties. Even if the United States were to do so, that would not excuse PDVSA's unlawful conduct. Nor is PDVSA's status as an OFAC blocked entity an element or prerequisite for any of Plaintiffs' claims.

## II. CVP'S TERRORISM AGAINST U.S. CITIZENS, INCLUDING THE PLAINTIFFS.

### A. Overview of CVP

---

[32] *See* Executive Order 13884, Blocking Property of the Government of Venezuela (Aug. 5, 2019), available at https://www.federalregister.gov/documents/2019/08/07/2019-17052/blocking-property-of-the-government-of-venezuela.

[33] *Id.*

89.     CVP is a subsidiary of PDVSA.  Within the structure of PDVSA, CVP serves as the strategic business unit responsible for managing the Venezuelan state's interests in Joint Ventures (known as *Empresas Mixtas*).

90.     Under Venezuelan law, the state must hold a majority stake (at least 60%) in oil projects. CVP is the legal entity that holds these shares and coordinates with private companies to explore and produce oil.  CVP is the "manager" that sits at the table with foreign partners.  While PDVSA handles the overall national oil business, CVP specifically manages the dividends and administrative oversight of the profits generated by these joint partnerships.

91.     CVP is the primary architect for developing the Orinoco Oil Belt (*Faja Petrolífera del Orinoco*), which contains the world's largest extra-heavy crude reserves. It oversees offshore gas projects and licenses, acting as the bridge for international investment in Venezuela's gas sector.

92.     The billions of dollars generated by the joint ventures CVP controls are routinely swept up by PDVSA and the central government to fund state programs, pay off sovereign debt, or enrich corrupt insiders.

**B.      CVP Provides Material Support to Maduro, Fostering His Authoritarian Control of Venezuela, i.e., the Platform From Which Maduro Terrorized U.S. Citizens**

93.     During Maduro's reign in Venezuela, executives of CVP had a specific "lifecycle."

94.     First, Maduro would appoint and embrace his preferred CVP executives, who were loyalists owing fealty to him.  Maduro often would appoint the CVP executives to joint roles as senior managers at PDVSA and, in some instances, they would also serve as Venezuela's Oil Minister.  In their roles as CVP senior management, the Maduro executives would manage the cash-heavy joint ventures in which CVP held a majority interest.  And even if certain of Maduro's

32

hand-chosen flunkies were not directly appointed to managerial roles at CVP, those individuals nevertheless often would be positioned to control CVP, which does not independently negotiate the terms of its joint ventures.  Rather, key directives regarding who CVP partners with, how much it charges, and when it breaches contracts come directly from the Ministry of Petroleum (whose Minister was appointed by Maduro) or directly from the Miraflores presidential palace, i.e., from Maduro and his palace insiders.

95.   Second, the CVP executives would—with a warm nod from Maduro—engage in all manner of corruption, thereby fostering Maduro's patronage system, in which Maduro enthusiastically doled out access to the lucrative flow of oil-related graft at CVP in exchange for the executives and their cronies lending their support, and generating cash, essential to enable Maduro's continued authoritarian control of an increasing failing, economically desperate, and unstable state.  "Oil revenues—captured and distributed without oversight—became a critical tool for rewarding loyalty among the security forces and political elite, thereby entrenching authoritarian rule."[34]   "Maduro's government relies on distributing economic privileges to maintain the loyalty of military, police, and political elites, especially as popular support wanes. Corruption, fueled by oil revenues, remains a central mechanism for consolidating control, even as Venezuela's broader oil industry declines." *Id.*

96.   Third, when Maduro's needs changed, Maduro would use the CVP executives' corruption as the legal basis for an arrest (or at least a changing of the guard), with Maduro

---

[34] Jose Ignatio Hernandez, Oil Licenses and Repression, The Human Rights Impact of Sanctions Policy in Venezuela, Georgetown Journal of Int'l Affairs May 14, 20250, available at https://gjia.georgetown.edu/human-rights-development/oil-licenses-and-repression-the-human-rights-impact-of-sanctions-policy-in-venezuela/.

portraying himself as a "crusader against graft." Maduro would then replace the outgoing executives with a new crop of loyalists better suited to meeting Maduro's ever evolving needs.

**1. Post-Chavez "Boliburguesía" Management of CVP (2013 to 2017)**

97. When Hugo Chávez died in 2013, Nicolás Maduro inherited a collapsing economy and a deeply fractured ruling party. Maduro had won the presidency by a razor-thin margin and lacked Chávez's charisma and unquestionable authority over the military. To prevent a coup from within his own ranks, Maduro had to buy the absolute loyalty of the military generals and the political elite. He needed cash, and he needed it fast.

98. Maduro leaned heavily on Boliburguesía (the "Bolivarian Bourgeoisie"), a corrupt elite class—including military generals, government ministers, media moguls like Raúl Gorrín, and foreign logistical fixers and money launderers like Alex Saab—who all had become fabulously rich under Chávez. Chávez had created the Boliburguesía as nouveau elites from scratch, by funnelling corrupt government proceeds to them and making them insiders in his kleptocracy. Chávez did that strategically, after Venezuela's old guard elite supported an attempted coup against Chávez in 2002, and Chávez realized he needed a new elite that would be unquestioningly loyal to him.

99. Because the Boliburguesía that Chávez established already had the financial architecture in place to generate cash, Maduro leaned heavily on them. Within the Boliburguesía, Maduro especially relied upon Los Bolichicos, a generation of extremely young businessmen, who made their first massive fortunes around 2009 and 2010, when the core members—such as Alejandro Betancourt, Francisco Convit, and Pedro Trebbau—were only in their twenties or early thirties. By allowing these elites to continue looting state joint ventures and exploiting currency

34

exchange rates, Maduro ensured that the top brass of the military and the government remained incredibly wealthy. In exchange for this wealth, they kept Maduro in the presidential palace.

100. During the period of Boliburguesía management at CVP and PDVSA, important senior CVP executives included, among others, Eulogio Del Pino, Orlando Chacín, and Pedro León.

101. **Eulogio Del Pino, CVP President, 2005 to 2014, and intermittently thereafter.** Eulogio Del Pino, while often known as the CEO/President of the parent PDVSA and Oil Minister, spent many years specifically at the helm of CVP, particularly from around 2005 to 2014, and later intermittently. He was the primary architect of the "Joint Venture" model managed by CVP. Del Pino was once one of Maduro's most trusted technocrats. Maduro personally appointed him as President of PDVSA and later as Minister of Petroleum. Del Pino was frequently seen by Maduro's side during international OPEC meetings and televised cabinet sessions.

102. Because CVP controlled the state's majority stake in every foreign joint venture, Del Pino had the power to dictate who got to partner with PDVSA, whose shares could be sold, and which private companies received massive procurement contracts. Del Pino's corruption at CVP centered on extortion, wildly inflated no-bid contracts, and the deliberate doctoring of production figures.

103. While the Venezuelan state treasury and the Venezuelan people absorbed the catastrophic financial losses, the economic benefits of Del Pino's tenure at CVP flowed directly into the pockets of a specific network of political insiders and crony capitalists. The massively inflated procurement budgets at CVP joint ventures were a goldmine for well-connected Venezuelan elites, the Boliburguesía, including especially several Los Bolichicos. These included the young billionaire founders of Derwick Associates, Alejandro Betancourt and Francisco Convit.

While Del Pino signed the paperwork and approved the joint venture structures, it was contractors like Derwick who billed for phantom services, exploited artificial currency exchange rates, and ultimately funneled hundreds of millions of dollars out of the joint ventures and into luxury real estate in Miami and Spain.

104.    To keep their hands clean, CVP executives like Del Pino rarely took bribes directly into their own bank accounts. The economic benefits were frequently reaped by offshore middlemen who posed as "consultants." In one instance, for example, a $10 million bribe was demanded by a Florida-based consultant operating through a web of LLCs and shell companies. These fixers took a percentage of the extortion money as a laundering fee before funneling the rest to the PDVSA brass.

105.    On November 3, 2017, Canada sanctioned Del Pino pursuant to its *Justice for Victims of Corrupt Foreign Officials Act* (often referred to as Canada's Magnitsky Law).  The accompanying Press Release explained: "Today's announcement sends a clear message that Canada will take action against individuals who have profited from acts of significant corruption or who have been involved in gross violations of human rights."[35]

106.    **Orlando Chacín, CVP President, 2014 to 2017**. Orlando Chacín served as CVP President from around 2014 to 2017 and was a major figure in the management of joint ventures with international partners. Chacín also served as the Vice President of Exploration and Production at PDVSA. Chacín was a long-term "PDVSA man" who reached the presidency of CVP under

---

[35] *See* Press Release, Global Affairs Canada, Canada imposes sanctions on individuals linked to human rights violations and corruption (Nov. 3, 2017), available at https://www.canada.ca/en/global-affairs/news/2017/11/canada_imposes_sanctionsonindividualslinkedtohumanrightsviolatio.html.

Maduro's oversight. He was part of the leadership circle that managed the critical joint ventures that kept the Maduro government solvent during the first wave of U.S. sanctions.

107.  Chacín's corruption primarily involved rigged procurement and massive embezzlement within international joint ventures.  Among other things, Chacín, alongside Del Pino and other top executives, orchestrated a sprawling network of sabotage, rigged contracting, and embezzlement within Petrozamora, a massive joint venture operated by CVP and Gazprombank Latin America Ventures.  The executives allegedly handed out wildly inflated contracts for oilfield maintenance and services that were either never performed or deliberately botched, creating an environment where contractors could bill for phantom services.  Venezuela lost an estimated 15.7 million barrels in lost crude production, translating to hundreds of millions of dollars in damages.

108.  **Pedro León, Executive Director, CVP, 2013 to 2017**.  Pedro León, often referred to in Venezuelan media as the "Czar" of the Orinoco Oil Belt, was the Executive Director of the CVP Orinoco division and held significant authority over CVP operations from around 2013 to 2017.  León controlled the awarding of highly lucrative contracts in the world's largest oil reserve. León orchestrated a sprawling network of phantom companies, handing out dozens of no-bid contracts for everything from oil drills to food imports in the Orinoco Belt.  León's power base was built under the Maduro administration. While he was often linked to other high-ranking Chavista figures like Diosdado Cabello (a senior officer in the Cartel of the Suns, sanctioned by OFAC on May 18, 2018, for "exploit[ing] [his] official position[] to engage in narcotics trafficking, money laundering, embezzlement of state funds, and other corrupt activities."[36]), León

---

[36] Press Release, OFAC, *Treasury Targets Influential Former Venezuelan Official and His Corrupt Network*, (May 18, 2018), https://home.treasury.gov/news/press-releases/sm0389.

37

operated with the full authority of the Maduro government for years, overseeing the state's most valuable oil assets

109.   Some individuals involved in this misconduct have been prosecuted in the United States.  Below are several examples.

110.   **Marin Sanguino**.  Jhonnatan Teodoro Marin Sanguino ("Marin Sanguino") served as mayor of Guanta, a port city in the oil-rich Orinoco belt of Venezuela, from in or around 2008 until in or around 2017. In April 2022, Marin Sanguino was indicted in the U.S. District Court for the Southern District of Florida for, among other crimes, money laundering.[37]  Marin Sanguino's money laundering conspiracy included "companies [that] received tens of millions of dollars in payments on contracts from the PDVSA Subsidiaries into bank accounts in South Florida."  Some of the CVP subsidiaries that were involved in this multi-million-dollar money laundering conspiracy in the Southern District of Florida include: PetroCedeño S.A., PetroMonagas S.A., Petrolera Sinovensa S.A., and PetroMiranda S.A.[38]

111.   **Lennys Rangel.** PetroCedeño is a CVP subsidiary. PetroCedeño also has played an important role in supporting Maduro's kleptocracy and theft of assets rightfully belonging to the Venezuela people. Lennys Rangel was head of procurement at PetroCedeño from March 2015 to in or around December 2015. During that time, Rangel received millions of dollars in bribes in exchange for assisting certain contractors (selected by senior PDVSA officials) to gain improper advantages, thereby ensuring that the contractors that paid bribes would be awarded the lucrative PetroCedeño contracts. She has been indicted in federal court in Miami for that criminal misconduct.

---

[37] *United States v. Jhonnatan Teodoro Marin Sanguino,* 22-cv-20164 (S.D. Fla. April 21, 2022).

[38] *Id.*

112.    **Eduardo Orsoni.** Eduardo Orsoni, the general counsel of PetroCedeño from 2009 to 2013, also received millions of dollars in bribes in exchange for directing contracts to certain contractors, in accordance with instructions from senior PDVSA officials. He too has been indicted in federal court in Miami for that criminal misconduct.

### 2.    Military Management of CVP (2017 to 2020)

113.    By 2017, Maduro was again facing an existentially dangerous threat to his presidency. He was facing a "perfect storm" of catastrophic crises that threatened to topple his regime from three sides: (1) the streets, (2) the international financial system, and (3) his own political party.  In response, he handed control of PDVSA and CVP to Major General Manuel Quevedo in late 2017 as an emergency, coup-proofing survival tactic.

114.    *The Streets.*  First, In the spring and summer of 2017, Venezuela exploded. After the regime-controlled Supreme Court attempted to strip the opposition-led National Assembly (Venezuela's legislative branch) of its powers, millions of Venezuelans took to the streets in months of daily, violent protests.  The opposition was unified, the international community was turning against Maduro, and the protests were threatening to overwhelm state security.  To survive, Maduro needed the armed forces—specifically the Bolivarian National Guard (GNB)—to brutally suppress the population. The military killed over 100 protesters during this period. Maduro could not ask a military to execute that level of domestic repression for free; he had to pay them. Major General Manuel Quevedo was an officer in the National Guard. By handing him PDVSA and CVP, Maduro essentially gave the military the keys to the national treasury as a reward for keeping him in the presidential palace.

115.    *The international financial system.* By late 2017, the oil money that had sustained the regime was drying up at a terrifying rate. The civilian technocrats (like Eulogio Del Pino and

Orlando Chacín) had entirely failed to halt the collapse of Venezuela's oil production, which was plummeting due to years of underinvestment and corruption.  On top of which, the Trump administration imposed crippling financial sanctions, prohibiting the U.S. financial system from participating in new debt issued by the Venezuelan government or PDVSA.  Cut off from credit markets, PDVSA and Venezuela formally defaulted on their sovereign bonds in November 2017. Maduro realized that with limited oil revenues left, he could no longer afford to let civilian technocrats control the cash flow. He needed his most heavily armed loyalists physically holding the purse strings to ensure the remaining funds were used for regime survival.

116.    *Maduro's own political party.* In 2017, Maduro was facing a severe internal threat from Rafael Ramírez, the incredibly powerful former Oil Minister who ran PDVSA for a decade under Hugo Chávez.  Ramírez, who was serving as Venezuela's envoy to the UN, was becoming increasingly vocal in his criticism of Maduro's economic mismanagement. Maduro correctly viewed Ramírez as a potential rival who might try to replace him from within the socialist party. The civilian technocrats running PDVSA and CVP in 2017—Eulogio Del Pino, Nelson Martínez, and Orlando Chacín—while loyal to Maduro, were more closely aligned with Ramírez. Maduro used collapsing oil production as the perfect excuse to declare an "anti-corruption crusade." He arrested Del Pino and Chacín, effectively decapitating Ramírez's power base inside Venezuela. By replacing them with a military general who had no ties to Ramírez, Maduro secured total, unquestioned control over the state's most powerful institution.

117.    In the 2017 purge, Maduro (1) charged Del Pino with corruption and embezzlement of over $500 million, doctoring oil production figures, and conspiring to sabotage the national economy, (2) charged Chacin with using irregular acquisition of company vehicles with a 50% surcharge, intentional embezzlement and evasion of bidding processes, sabotaging the

40

"Petrozamora" joint venture, and engaging in corruption that led to a massive drop in crude production, (3) charged León with embezzlement and conspiracy related to a scheme where he allegedly steered billion-dollar contracts to favored companies in exchange for kickbacks. Maduro personally denounced the corruption in the Orinoco Belt during national broadcasts and framed León's "betrayal" as a strike against the "mafias" within the state, despite León having operated openly within the system for over a decade.

118.    **Major General Manuel Quevedo, CVP President, 2017 to 2020.**  On December 6, 2017, via Presidential Decree No. 3.190 (published in the *Gaceta Oficial* N° 41.294), Major General Manuel Quevedo was officially named President of the CVP.  This move gave a single National Guard officer an unprecedented trifecta of power. Quevedo concurrently served as the Minister of Petroleum (setting state energy policy), the President of PDVSA (running the parent company), and the President of CVP (controlling the international joint ventures).

119.    Handing a military general the presidency of CVP was a highly strategic move by the Maduro regime. CVP is not just a standard administrative subsidiary; it is the specific arm of PDVSA responsible for administering and controlling all joint ventures with foreign oil companies, such as Russia's Rosneft and China's CNPC.  By placing a military loyalist directly at the head of CVP, Maduro achieved two critical objectives: (a) Maduro handed the armed forces the keys to the specific international partnerships that were actually producing oil and generating foreign currency, effectively purchasing the military's continued political backing during a period of intense economic crisis; and (b) Maduro stripped the civilian technocratic wing of its ability to negotiate international contracts, ensuring that all foreign oil revenue and partnerships were managed directly by the military-security apparatus.

120. When Quevedo took over, he systematically purged the civilian oil engineers and replaced them with military officers who had zero experience in the energy sector. For example, he installed Rafael Urdaneta—a military officer who previously worked for Quevedo in the housing ministry—as the Vice President of CVP. These military commanders ran the joint ventures with an iron fist, alienating foreign partners.

121. Because the military officers lacked the technical expertise to actually increase oil production (which collapsed to 70-year lows during Quevedo's tenure), they turned to cannibalizing the company itself. Industry sources and workers reported a sharp increase in direct extortion, with military commanders demanding arbitrary cuts, bribes, and "fees" to allow basic operational approvals or the movement of equipment. Military personnel and corrupt managers systematically stripped PDVSA and CVP facilities of their physical assets. They looted copper wire, heavy machinery, pumps, and vehicles. These vital components were not replaced; instead, they were smuggled out of the facilities and sold as scrap metal on the black market. This asset stripping physically destroyed the infrastructure of the Orinoco Oil Belt.

122. As Venezuela's domestic refineries collapsed due to mismanagement and lack of maintenance, the country faced severe gasoline shortages. Quevedo's military network effectively privatized the remaining fuel supply. National Guard troops took physical control of the gas stations across the country. Officers created a lucrative black market, extorting desperate citizens for access to fuel in U.S. dollars, or smuggling heavily subsidized Venezuelan gasoline across the borders into Colombia and Brazil for massive profits.

123. To bypass U.S. sanctions, Quevedo oversaw the initial shift toward the "shadow fleet" network—selling off Venezuela's crude through unknown intermediaries, dark vessels, and off-the-books transactions. This completely removed PDVSA's revenues from public audits or the

42

Central Bank, turning the remaining oil sales into an unaccountable slush fund.  In early 2019, the U.S. Department of the Treasury sanctioned Quevedo directly.   Then-U.S. National Security Advisor John Bolton publicly stated at the time that: "General Quevedo, the president of Maduro's corrupt oil slush fund PdVSA, is now subject to U.S. sanctions. Don't risk dealing with him!"[39] Treasury explained that it "continues to target officials," including Quevedo, "who have helped the illegitimate Maduro regime repress the Venezuelan people. . . .  We are intent on going after those facilitating Maduro's corruption and predation, including by sanctioning the President of PdVSA and others diverting assets that rightfully belong to the people of Venezuela."[40]

124.    The most direct economic beneficiaries were the high-ranking officers of the Bolivarian National Guard (GNB) and the Army. By placing Quevedo in charge, Maduro allowed the military to directly access the joint ventures, the smuggling routes, and the asset-stripping profits. It effectively transformed the armed forces into wealthy shareholders of the collapsing state.

125.    While the Venezuelan economy bled, Maduro was the ultimate political beneficiary. By handing PDVSA and CVP over to Quevedo and his generals, Maduro explicitly purchased the loyalty of the armed forces. They enriched themselves on the oil graft, and in exchange, they kept their guns pointed at the protesters, ensuring Maduro stayed in power.

### 3.    Cartel of the Suns Management of CVP (2020 to 2023)

---

[39] Ambassador John Bolton, X (formerly Twitter) Post (Feb. 16, 2019), available at https://x.com/AmbJohnBolton/status/1096966464060436481.

[40] OFAC, Press Release, Treasury Sanctions Officials Aligned with Former President Nicolas Maduro and Involved in Repression and Corruption (Feb. 15, 2019), available at https://home.treasury.gov/news/press-releases/sm612.

126. By early 2020, the experiment of letting Major General Manuel Quevedo and the military run PDVSA and CVP was a catastrophic failure. The military was highly effective at repressing protests and stripping the oil infrastructure for scrap metal, but they lacked any technical or commercial expertise. Under Quevedo's watch, Venezuelan oil production collapsed to historic, 70-year lows. Moreover, in 2019, the U.S. imposed "maximum pressure" sanctions on PDVSA. The military brass did not know how to sell oil in a sanctioned environment. When the U.S. finally sanctioned the Russian companies (Rosneft) that had been helping PDVSA market its crude in early 2020, the Venezuelan oil sector ground to an almost total halt. Maduro was out of cash, and the generals had no idea how to fix it.

127. **Tarek El Aissami, Minister of Petroleum, 2020 to 2023.** Maduro appointed El Aissami as Minister of Petroleum from 2020 to 2023. In light of U.S. sanctions, Venezuela essentially had to start treating its crude like illegal narcotics. It had to be smuggled if it was going to be sold. That is why handing the keys to the country's oil wealth to Tareck El Aissami was a highly calculated, logical move for Maduro. At the time, El Aissami was a senior leader of the Cartel of the Suns. In February 2017, OFAC had sanctioned El Aissami under the Foreign Narcotics Kingpin Designation Act for facilitating drug shipments from Venezuela to the United States. El Aissami was also the key facilitator of the Maduro Regime's support for Hezbollah. In 2014 Robert Morgenthau, then the Manhattan District Attorney, indicated that El Aissami had provided Venezuelan passports to terror organizations including Hamas and Hezbollah. El Aissami is listed on U.S. Immigration and Customs Enforcement (ICE)'s 10 most wanted list.

128. From Maduro's perspective, the fact that El Aissami was a leader in the Cartel of the Suns wasn't a liability—it was his primary qualification. El Aissami already possessed a masterclass resume in transnational organized crime. He knew exactly how to move illicit goods,

hide money in offshore jurisdictions, and bypass U.S. financial radar.  Maduro realized that to survive the sanctions, he needed someone who could build a massive, clandestine "shadow fleet" of ghost ships and orchestrate billions of dollars in untraceable cryptocurrency and cash transactions. The military appeared unable to do that. El Aissami could.

129.   El Aissami, who is of Syrian-Lebanese descent, was Maduro's primary liaison to the Middle East. While the military generals were isolated in Caracas, El Aissami had deep, long-standing ties to foreign actors who were also heavily sanctioned by the West.  When Venezuela's refineries collapsed and the country ran out of gasoline, it was El Aissami who brokered the emergency deals with Iran. He arranged for Iranian tankers to cross the ocean and deliver fuel to Venezuela, paying for it with Venezuelan gold and crude oil.  He had the geopolitical rolodex required to find the shadowy middlemen in the UAE, Turkey, and Asia who were willing to buy CVP's sanctioned crude.

130.   El Aissami did not just profit from the corruption surrounding CVP—he was the ultimate architect of the largest, most devastating financial embezzlement scheme to ever hit the Venezuelan oil sector, explicitly exploiting the crude oil produced by CVP's joint ventures.  While El Aissami was not a CVP executive, El Aissami, as Venezuela's Minister of Petroleum (from 2020 to 2023), held absolute supreme authority over CVP and every joint venture it managed. He used that power to orchestrate what is now known globally as the "PDVSA-Cripto" scandal.

131.   When strict U.S. sanctions largely cut PDVSA off from the traditional global financial system, the joint ventures managed by CVP (which were the only entities still reliably pumping oil) had a massive problem: they had crude, but no legal way to sell it.  El Aissami used this crisis as a smokescreen to launch his scheme.  As Oil Minister, El Aissami bypassed all legal contracting and procurement rules. He ordered the crude oil extracted from CVP's joint ventures

45

in the Orinoco Oil Belt to be handed over to a vast network of unknown intermediaries, shadow traders, and shell companies. To evade U.S. sanctions and hide the money trail, El Aissami mandated that these shadow buyers pay for the CVP-extracted oil using cryptocurrencies (like USDT) or pallets of physical cash.

132.    The scheme was incredibly simple: CVP's joint ventures pumped the oil, El Aissami's network loaded it onto ghost ships, the oil was sold in Asia, and the cryptocurrency payments simply vanished into the private wallets of El Aissami and his inner circle. According to investigations by Transparencia Venezuela and the regime's own internal audits, the money generated by the sale of CVP's oil never made it back to the Venezuelan national treasury or the central bank. Independent estimates and internal documents indicate that between $13 billion and $21 billion in oil revenues went entirely unaccounted for under El Aissami's watch.

133.    The massive oil theft presided over by El Aissami directly nourished the Cartel of the Suns in several critical ways.  First, it fueled the patronage network.  The survival of the Maduro regime relied heavily on buying the loyalty of the top military brass—the very core of the Cartel of the Suns. The billions siphoned from CVP did not just vanish; they were used to enrich these "military millionaires" and loyalists, keeping the cartel's hierarchy satisfied and ensuring their continued enforcement of regime control.

134.    Second, the obscure crypto-infrastructure set up by El Aissami was not exclusively used to hide oil money. It functioned as a massive washing machine for the regime's other illicit enterprises. El Aissami was essentially managing a dark financial network for the cartel, mixing state oil graft with profits from drug trafficking and illegal gold mining.

135.    Third, El Aissami's particular brand of covert oil sales for crypto payments gave rise to "Cryptocrats," a new echelon of ultra-wealthy elites within the regime. These individuals

46

leveraged the untraceable wealth generated from the oil theft to consolidate their power, expand the cartel's operations into digital finance, and safely stash their money away from international sanctions.

136.    Fourth, the PDVSA/CVP-Crypto network and the Cartel of the Suns functioned as a single, symbiotic entity.  El Aissami's corrupt infrastructure, designed to allow the shipping of oil on ghost ships, was also a boon to the Cartel.  When El Aissami's network compromised Venezuelan maritime authorities, port inspectors, and customs officials, the Cartel of the Suns used this exact same blind eye to load massive quantities of cocaine onto commercial container ships moving the drugs toward U.S. and other foreign markets.  The tactics used by the oil ghost ships—such as "spoofing" GPS locations, turning off AIS (Automatic Identification System) transponders, and falsifying ship registries—are the exact same maritime evasion tactics used by drug-running vessels operating out of Venezuelan waters.

137.    *Joselit Ramírez*.  Members of El Aissami's network who reaped the fruits of this massive graft included the state insiders who authorized the theft, and the private "oligarchs" who actually moved and hid the money.  The State insiders who authorized the theft included Joselit Ramírez**,** the head of Venezuela's cryptocurrency regulator (SUNACRIP). He was El Aissami's closest confidant and right-hand man. Ramírez was the chief architect of the financial black hole, responsible for converting the proceeds of black-market oil sales into untraceable digital assets (like USDT/Tether) and hiding them in private digital wallets.  Ramírez used the exact institutional power Maduro gave him to build the money-laundering black hole that swallowed the oil revenues. Ramirez's job was to clean El Aissami's dirty money (including from drugs, oil, and gold), and as the head of SUNACRIP, Ramírez had the perfect state-sanctioned cover to move billions of dollars off the grid.  The crypto network Ramírez built was used to launder, not just embezzled oil funds

from the PDVSA-Crypto scandal, but also cash generated by the Cartel's narcotics trafficking and illegal gold mining operations in the Orinoco Mining Arc.

138. *Hugbel Roa.* El Aissami was further assisted by Hugbel Roa, a powerful National Assembly deputy and former government minister. Roa acted as the political fixer for the El Aissami network, using his influence to ensure that massive shipments of PDVSA crude were allocated to El Aisssami's preferred circle of private businessmen. Roa was a trusted, inner-circle politician who used his Maduro-stamped authority to allocate oil shipments for the benefit of the civilian crypto oligarchs. Both Ramirez and Roa were senior Maduro insiders, who Maduro himself appointed to their political posts. Roa was the architect of El Aissami's physical laundering infrastructure. He managed a vast network of testaferros (frontmen or strawmen). His primary role was organizing the logistics of the graft. By helping El Aissami consolidate total control over PDVSA's dark revenue, Roa was intrinsically feeding the same patronage network that sustains the military generals and cartel elites. The financial washing machinery that Roa and Ramírez built to hide oil money were utilized by the broader regime to hide all types of illicit revenue.

139. *Colonel Antonio Pérez Suárez.* Pérez Suárez was one of Maduro's most trusted and heavily utilized military loyalists. He served as the Vice President of Commerce and Supply at PDVSA during the height of the El Aissami era. Maduro publicly praised Colonel Pérez as an "officer of great sensitivity and capacity to work." Maduro and El Aissami installed Pérez Suárez as the Vice President of Commerce and Supply at PDVSA, despite the fact that Pérez Suárez had no experience in the global energy sector. This position made Pérez Suárez a key gatekeeper of the oil industry.

140. As a high-ranking military officer deeply embedded in the regime's illicit revenue streams, Pérez Suárez ensured that the military-elite faction of the Cartel received its cut of the

48

billions generated by the shadow oil trade.  Pérez Suárez also was the official who physically signed the authorizations to hand over billions of dollars worth of state crude oil to the shadowy network of shell companies and civilian crypto-oligarchs.

141.    ***Alex Saab.***    Another key player in El Aissami's network was Alex Saab.  The Center for a Free Cuba states, "Alex Saab's money-laundering network facilitated the profits of the Soles Cartel's cocaine trafficking to the United States."[41] Moreover, "Saab has played a key role in establishing and maintaining the illicit financial networks that facilitate corruption, and Maduro reportedly entrusted him with his personal wealth."[42]

142.    The offshore financial architecture Saab built was effectively the central bank for the regime's illicit wealth. Secretary of State Marco Rubio has described Alex Saab as a "financier and money launderer for Maduro."[43] Saab also ran a scheme that stole hundreds of millions in dollars from food-import contracts from the CLAP food subsidy program at a time of widespread hunger mainly due to shortages in Venezuela. Through CLAP graft, Saab directly funneled loot to Maduro and his family.

143.    Although Alex Saab is most notorious for acting as the financial bagman for the Maduro family through the CLAP food-box program, Saab's operations eventually expanded into CVP's territory.  Once sanctions cut PDVSA off from the global financial system, Saab became a

---

[41] *Cuba Brief: Déjà Vu in Venezuela for Cuba Watchers?*, Center for a Free Cuba, (Dec. 21, 2023), https://www.cubacenter.org/archives/2023/12/21/cubabrief-deja-vu-in-venezuela-for-cuba-watchers-american-hostages-swapped-for-high-profile-regime-figures-what-will-the-cost-be-in-future-hostages-and-american-lives.

[42] *Maduro Regime to Shield Alex Saab from Extradition*, Robert Lansing Institute, (June 23, 2021), https://lansinginstitute.org/2021/06/23/maduro-regime-to-shield-alex-saab-from-extradition/.

[43] Press Release, Senator Marco Rubio, *Rubio, Cruz Warn President Against Making Further Concessions to Maduro Narco Regime,* (Oct. 26, 2022), https://www.rubio.senate.gov/rubio-cruz-warn-president-against-making-further-concessions-to-maduro-narco-regime/.

critical logistical fixer for moving Venezuelan oil. Saab used a vast network of shell companies in places like the UAE and Turkey to market the crude produced by CVP's joint ventures, taking massive cuts of the proceeds to enrich himself and the Maduro family.

144. El Aissami, as Minister of Petroleum, oversaw the entire "PDVSA-Cripto" architecture, approving the allocation of massive shipments of crude to Alex Saab and other unknown intermediaries, allowing them to bypass traditional financial controls. El Aissami's network also included private oligarchs (such as Álvaro Pulido, the notorious Colombian business partner of Alex Saab) who moved the proceeds from the sale of pilfered Venezuelan oil.

145. Because the Cartel of the Suns generates billions in physical cash from cocaine, and CVP generates billions in illicit kickbacks and shadow-fleet oil sales, the two entities ultimately rely on the same network of financial fixers to clean their money. The offshore shell companies, the crypto-currency evasion networks (like the "PDVSA-Cripto" ring), and the logistics experts (like Alex Saab) were used interchangeably to wash the regime's oil money and its drug money.

146. The DOJ has explicitly indicted Maduro and Diosdado Cabello as the primary leaders and facilitators of the Cartel of the Suns and indicted El Aissami for violating the Kingpin Act.[44] Alex Saab was the personal financial envoy and "super-facilitator" for these exact same men. Saab orchestrated the sale of illicit gold, managed the "shadow fleet" of oil tankers, and brokered deals with Iran on their behalf. As the primary financial architect for the leaders of a narco-terrorist organization, Alex Saab's financial networks absorbed and washed the proceeds of their narcotics trade. In sum, the military traffics the drugs (the Cartel), the state oil company

---

[44] El Aissami Indictment para. 1; *United States v. Maduro*, 11-cr-205 (S.D.N.Y.), Superseding Indictment, para. 4, 6 ("2020 Maduro Indictment"), https://www.justice.gov/opa/page/file/1261806/dl?inline.

provides the corporate cover (PDVSA/CVP), and financial fixers leverage the state oil companies' cover (with their blessing) to wash the money (Saab).

147. While the Venezuelan people suffered a historic economic collapse, the proceeds of this stolen oil funded an explosion of illicit luxury inside Venezuela, financing mansions, private jets, and an elite class of young, newly minted crypto-oligarchs loyal to El Aissami.

148. Alex Saab was indicted in the United States District Court for the Southern District of Florida for conspiracy to commit money laundering in connection with a scheme involving at least $350 million in wire transfers, representing the proceeds of a scheme that bilked the Venezuelan government of funds intended to purchase low income housing.[45] On or about October 16, 2020, Alex Saab was extradited from the Republic of Cabo Verde to the United States to face criminal charges; however, Alex Saab was subsequently released in exchange for ten U.S. citizens, who Maduro had indiscriminately kidnapped to swap for Saab's release.

149. ***Samark Lopez Bello.*** López Bello was Tareck El Aissami's primary testaferro (frontman), chief financial architect, and closest personal associate. López Bello managed the sprawling international network of shell companies, offshore bank accounts, and luxury assets that El Aissami used to hide his wealth. During the PDVSA-Crypto era, López Bello was instrumental in routing the stolen state funds. The US Treasury Department explicitly designated López Bello under the Foreign Narcotics Kingpin Designation Act for providing material assistance, financial backing, and goods/services in support of El Aissami's international narcotics trafficking activities. Essentially, López was the chief money launderer for El Aissami's wing of the Cartel of the Suns, washing narco-dollars and oil graft side-by-side.

### 4. Post-El Aissami Management of CVP: 2023

---

[45] *United States v. Alex Nain Saab Moran*, 19-cr-20450 (S.D. Fla., July 25, 2019).

150.    Maduro did not wake up in March 2023 and suddenly discover that El Aissami's network was deeply corrupt. The "shadow fleet" and the crypto-laundering had been operating in plain sight within the regime for years, and Maduro not only knew about it, but indeed profited from it.  Nevertheless, Maduro purged El Aissami and the El Aissami network because they broke the rules of the autocracy, and he was running out of time.

151.    In a clientelist autocracy, the dictator needs cash to buy loyalty, fund social programs (like the CLAP food boxes), and pay off the military.  By early 2023, inflation in Venezuela was spiking again, public sector workers were protesting in the streets over starvation wages, and Maduro was staring down the barrel of the 2024 presidential election. He desperately needed money to fund his upcoming campaign and to pacify the public.

152.    When Maduro looked to the state oil company to provide that necessary cash, the vaults were empty. El Aissami's network had siphoned an estimated $13 billion to $21 billion in recent oil sales into private crypto wallets, Dubai real estate, and offshore accounts.  The crypto oligarchs were no longer just skimming off the top; they were keeping *everything*. They were starving the central government. Maduro was forced to act because his regime was physically running out of the money required to survive the upcoming election cycle.

153.    Moreover, in a dictatorship, a subordinate who becomes completely financially independent of the leader is no longer an asset—they are an existential threat. Tareck El Aissami had built his own empire. He controlled the Ministry of Petroleum, the cryptocurrency regulator (SUNACRIP), and had deep ties to the intelligence services. His civilian "crypto oligarchs" were fiercely loyal to him, not to Maduro. Other powerful factions within the regime—specifically the powerful Rodríguez siblings (Jorge Rodríguez, head of the National Assembly, and Delcy Rodríguez, the Vice President)—recognized that El Aissami's massive, unaccountable wealth

52

made him a potential challenger to Maduro's throne. They likely pushed Maduro to eliminate El Aissami before he could use that $21 billion war chest to mount an internal palace coup.

154.   In November 2022, the Treasury Department granted a leading U.S. oil company a license to legally resume pumping and exporting Venezuelan oil to the United States. Suddenly, Maduro had a pathway to sell oil legally, transparently, and for actual U.S. dollars through a major American corporation. He was also in deep back-channel negotiations with the U.S. for broader sanctions relief.  Maduro could no longer have a sanctioned narco-trafficker running a multibillion-dollar crypto-smuggling ring out of the same offices where U.S. oil executives were trying to conduct business.

155.   Accordingly, Maduro conducted yet another sweep.  When the PDVSA-Crypto scandal broke in 2023, El Aissami was forced to suddenly resign (on a social media post) as Venezuela's Minister to Petroleum.  El Aisammi then vanished from public view for a year.  He was arrested in 2024, and charged with crimes ranging from Treason to embezzlement to money laundering.  Dozens of top-tier government officials, military officers, and civilian contractors who made up El Aissami's "crypto-oligarch" network were also arrested, including Joselit Ramírez, Hugbel Roa, and many others.

156.   While El Aissami himself was ousted and stripped of his personal empire, the broader machinery of the Cartel of the Suns had already absorbed the billions generated by the PDVSA-Crypto pipeline, utilizing the stolen wealth to fortify their grip on the country's illicit and formal economies alike.

157.   Maduro appointed Colonel Pedro Tellechea as Minister of Petroleum and President of PDVSA, and made Luis Enrique Molina Duque leader of CVP.  But in late October 2024, the cycle repeated itself. Maduro abruptly fired Tellechea and ordered his arrest.

53

C. **CVP's Central Role in the PDVSA Money Laundering Network that Benefits Maduro and the Cartel of the Suns.**

158. At all relevant times, CVP functioned as an important node in PDVSA's money laundering network that benefits Maduro and the Cartel of the Suns. CVP owns and/or controls—in coordination with, its parent, PDVSA—numerous companies that are joint ventures between CVP and non-Venezuelan entities. Through, and in coordination with, such entities, CVP has supported PDVSA's money laundering and Maduro's corruption, routinely leveraging the United States banking system in support of those illicit activities.

159. The lawful and semi-lawful operations of CVP joint ventures—such as PetroMonagas S.A., which was formed as a joint venture between CVP and Rosneft, a Russian state-controlled oil company—provided an ideal smokescreen for the Maduro regime to launder illicit funds, including narcotics proceeds generated by the Cartel of the Suns. Laundering billions of dollars in drug profits requires moving massive amounts of capital through the global financial system without triggering alarms. PetroMonagas, a heavy crude joint venture in the Orinoco Belt, naturally generated complex, high-value, and multi-jurisdictional financial transactions.

160. By operating under the guise of paying international contractors, purchasing heavy industrial machinery, and facilitating oil exports, cartel operators could embed illicit drug revenue into seemingly legitimate corporate cash flows. It is infinitely easier to justify a massive wire transfer of narcotics proceeds through a web of international shell companies if the stated purpose is "oil field procurement" for a recognized joint venture, rather than trying to move that cash with no paper trail.

161. The schemes in which PetroMonagas has been implicated often involve the use of opaque financial structures, shell companies, and third-party intermediaries to obscure the origin and destination of funds. In some (but by no means all) instances, PetroMonagas has been publicly

54

implicated in various schemes to evade sanctions, launder money, and engage in corruption on behalf of Maduro, the Cartel, and PDVSA.

162.    Similar laundering and sanctions evasion, on behalf of Maduro, the Cartel, and PDVSA, occurred at many other subsidiaries and joint ventures controlled by CVP, including but not limited to PetroCedeño S.A., Petrolera Sinovensa S.A., and PetroMiranda S.A.

## III.    THE VENEZUELAN CRIMINAL CONSPIRACY AND THE VENEZUELAN CRIMINAL ENTERPRISE

163.    The "Venezuelan Criminal Enterprise" is an association-in-fact that includes, among others, PDVSA, CVP, Maduro and the Cartel of the Suns.

164.    The "Venezuelan Criminal Conspiracy" is a conspiracy that includes, among others, PDVSA, CVP, Maduro and the Cartel of the Suns, all of which have agreed to commit a variety of interrelated crimes, including but not limited to (a) narcotics trafficking and narco-terrorism against the United States; (b) unlawful funding and provision of material support to terrorists through and from within the United States; (c) money laundering to, through and within the United States; (d) kidnapping, arbitrary detention, and torture of U.S. citizens (as well as Venezuelan citizens); and (e) public corruption offenses, bribery, embezzlement of government funds, and the like, in Venezuela. Each of Venezuelan Criminal Conspiracy's criminal endeavors is intrinsic to, and necessary to the functionality of, the overall criminal enterprise. Put differently, each line of criminal wrongdoing supports and reinforces the ability of the Venezuelan Criminal Conspiracy to commit each of the other criminal wrongdoing in which the Venezuelan Criminal Conspiracy engages.

165.    For example, a central objective of the Venezuelan Criminal Conspiracy at all relevant times was to assist Maduro to retain authoritarian control over Venezuela. By ensuring that Maduro unlawfully controlled the Venezuelan state, the Venezuelan Criminal Conspiracy

ensured that it could continue to commit profitable crimes—such as narcotics trafficking—with impunity and without interference from legitimate law enforcement in Venezuela.

166.    Conversely, the Venezuelan Criminal Conspiracy, through its earnings from profitable crimes such as narcotics trafficking, obtained wealth with which Maduro purchased the loyalty of his henchmen and loyalists, thereby cementing Maduro's authoritarian control over Venezuela (until his capture in early 2026). "A key to Maduro's resilience has been the loyalty he has retained among most Venezuelan security forces. For years, military leaders and other officials have enriched themselves through corruption, drug trafficking, and other illicit industries."[46]

167.    In other words, dirty money has been the lifeblood of the Venezuelan Criminal Conspiracy. As the *Washington Post* explained, "each year [the Cartel of the Suns] flies hundreds of tons of Colombian cocaine from Venezuelan airfields to Central America and the Caribbean for eventual distribution in the United States and Europe — and that [Cartel] includes some of the most senior officials in the Maduro regime. These men are not clinging to power because they are true believers in socialism . . . . They hang on because, in spite of Venezuela's economic implosion, they are still reaping millions."[47]

168.    And, through acts of terrorism and human rights abuses, the Venezuelan Criminal Conspiracy suppressed opposition to its narcotics trafficking, public corruption, and Maduro's authoritarian control of Venezuela.

169.    Because the foregoing crimes are interrelated, because each type of criminality furthers the other types of criminality, and because the Venezuelan Criminal Conspiracy

---

[46] *See* Congressional Research Service, *Venezuela, Background and U.S. Relations,* (Dec. 6, 2022), at 5, https://fas.org/sgp/crs/row/R44841.pdf.

[47] *Id.*

conspicuously engaged in each type of criminality, each and every co-conspirator in the Venezuelan Criminal Conspiracy has knowingly and intentionally agreed to all types of criminality in which the Venezuelan Criminal Conspiracy has engaged.

## IV.     THE KIDNAPPING AND TORTURE OF PLAINTIFFS

### A.     Carlos Marrón

170.     Mr. Marrón's had a website (DolarPro.com) that published the true, free market exchange rate between Venezuela's currency and U.S. dollars—a rate far different from Venezuela's official exchange rate that artificially inflated the value of the Venezuelan currency (the bolívar). Mr. Marrón's website was, therefore, an embarrassment to the Maduro Regime. And, because Maduro and his cronies, with PDVSA and CVP's assistance, were engaged in a variety of phenomenally profitable scams based on Venezuela's bogus official exchange rate, the Maduro Regime was hyper-sensitive about the true exchange rate.

171.     Although Mr. Marrón was physically in Miami (1,367 miles from Caracas, Venezuela) and his website was protected by the right to free speech enshrined in the U.S. Constitution, Mr. Marrón's elderly parents still lived in Venezuela. On April 10, 2018, Venezuela's General Directorate of Military Counterintelligence ("DGCIM")—a unit of the Venezuela security apparatus loyal to Maduro and notorious for arresting and torturing Maduro's political opponents—kidnapped Mr. Marrón's father.

172.     When Mr. Marrón learned that his father had been kidnaped, Mr. Marrón immediately purchased a ticket and flew from Miami to Caracas to help negotiate for his father's release, just as the DGCIM had hoped he would.

173.     When Mr. Marrón reached immigration at Simón Bolivar International Airport on April 11, 2018, armed DGCIM agents, who had been lying in wait until immigration reported Mr.

57

Marrón's arrival to them, kidnapped Mr. Marrón and took him to their headquarters in Caracas.

174.    The DGCIM released Mr. Marrón's father a few days after they kidnapped Mr. Marrón, but the DCGIM did not tell Mr. Marrón that they had done so. Instead, the DGCIM taunted Mr. Marrón, saying that they were "concerned" that his father would die in captivity without his medicine. In fact, during the time the DGCIM held Mr. Marrón's father, the DGCIM tortured Mr. Marrón's father by forcing him into a wooden box for four days without light or food.

175.    The DCGIM held Mr. Marrón at its facilities for 21 months. At the beginning, Mr. Marrón's family had no idea whether he even was alive. Senator Marco Rubio tweeted: "The families of . . . Carlos Marrón [and others], who are arbitrarily arrested by the #DGCIM, have the right to demand proof of life from their relatives."

176.    During the 21 months that Mr. Marrón was in DGCIM custody, DCGIM agents subjected Mr. Marrón to a wide variety of torture. Among other things, they beat Mr. Marrón with metal rebar, placed him in a hood filled with tear gas, and repeatedly subjected him to waterboarding. And they crammed him into a tiny, unsanitary punishment cell, with other political prisoners, where there was no running water or toilet. They served him rotted food infested with live insects. Mr. Marrón and the other prisoners were forced to defecate in plastic bags. Mr. Marrón lost 66 pounds while in DGCIM custody.

177.    The DCGIM also forced Mr. Marrón to reveal the passwords for his U.S. financial accounts, including accounts at Bank of America, Wells Fargo, Citibank that Mr. Marrón had opened in Miami, Florida (including account nos. ******9278 and ******2188). Then the DGCIM, using the passwords they had tortured from Mr. Marrón, electronically accessed his accounts on or about April 11-18, 2018  and stole his savings, transferring Mr. Marrón's money first to Mr. Marrón's account at Coinbase, and then transferring cryptocurrency (e.g., Bitcoin) to

their own wallets to cover their tracks.

178. Not content with what they could steal from Mr. Marrón, DGCIM agents also began to contact Mr. Marrón's wife to extort money from her. Beginning on or about June 2018 and continuing through approximately September 19,2019, in a seemingly endless series of calls to Maria Alejandra Alfonzo's cell phone, DGCIM agents spoke directly to Maria at her home in Coral Gables, Florida, threatening to break Mr. Marrón's arms, poison him, or transfer him to a prison where he would be ill-treated and possibly killed, unless Ms. Alfonzo sent them money (or, at times, items from their "wish list").

179. About a month and a half after Carlos' detention, Ms. Alfonzo received photos of her children in their pool and backyard in Coral Gables. The photos had been taken surreptitiously peeking from outside of the house without her knowledge. She received the photos from a Venezuelan cellphone number. This coincided with the first time her husband, Carlos Marrón, was going to be brought to court in Venezuela, and she took it as a warning for her to stay quiet.

180. Desperate, distraught, helpless, and increasingly dreading the ring of her own phone, Ms. Alfonzo repeatedly sent money to the DGCIM, frequently sending $5,000 to $20,000 at time, for a total of approximately $150,000. It was money she and her children could ill-afford.

181. Ms. Alfonzo has suffered atrocious injuries from her ordeal. As a direct consequence of Defendants' misconduct, Ms. Alfonzo—a formerly healthy, happy, and vibrant woman—has succumbed to cripplingly painful diseases that cannot be cured. She endures lasting physical and mental trauma and unabating emotional misery.

182. Among other things, when Mr. Marrón was kidnapped, Ms. Alfonzo began to suffer, and continues to suffer, from severe and debilitating insomnia. Immediate effects of insomnia include depression, fatigue, memory loss, concentration difficulties, and relationship

struggles. Complications from insomnia can include high blood pressure, heart disease, stroke and mood disorders.  Ms. Alfonzo's condition was aggravated by Defendants' continued direct contact with her, during which they repeatedly threatened to harm Mr. Marrón.

183.    As the result of stress caused by the Defendants, Ms. Alfonzo began to suffer from Raynaud's syndrome, in which blood vessels in the hands and feet appear to severely overreact to stress. During an attack of Raynaud's, Ms. Alfonzo's fingers turn white, swell, and throb with extreme pain. There is no cure for Raynaud's syndrome, and Ms. Alfonzo has not succeeded in preventing attacks through medicine. She relies primarily upon compresses and other minimally effective pain management techniques. Her Raynaud's attacks have not materially declined since her ex-husband escaped from his kidnappers' clutches.

184.    As the result of stress caused by the Defendants, Ms. Alfonzo began to suffer from outbreaks of carbuncles all over her body. A carbuncle is a cluster of boils (i.e., painful, puss-filled bumps) that form a connected area of infection. Compared with single boils, carbuncles cause a deeper and more severe infection and are more likely to leave a scar. People who have a carbuncle often feel unwell in general and may experience a fever and chills. Ms. Alfonzo's carbuncles have not materially abated since her ex-husband escaped from his kidnappers.

185.    As the result of stress caused by the Defendants, Ms. Alfonzo began to suffer from PTSD. People with PTSD have intense, disturbing thoughts and feelings related to their experience that last long after the traumatic event has ended. They may relive the event through flashbacks or nightmares; they may feel sadness, fear or anger; and they may feel detached or estranged from other people. People with PTSD may avoid situations or people that remind them of the traumatic event, and they may have strong negative reactions to something as ordinary as a loud noise or an accidental touch. Ms. Alfonzo is plagued with nightmares and flashbacks. Even discussing her and

her ex-husband's ordeal causes Ms. Alfonzo to relive the event surrounding his kidnapping and torture and is deeply disturbing to her emotional health.

186.    On January 6, 2020, the DGCIM (after having subject Mr. Marrón to 635 days of captivity and torture) released Mr. Marrón from its dungeons, but Mr. Marrón remained captive within Venezuela. The Maduro Regime continued to hold Mr. Marrón's passport and told him he could not leave Venezuela or use any of his assets to survive in Venezuela.

187.    Penniless, paperless, and fearing for his life, Mr. Marrón chose to make a daring escape. He traveled by car to the Colombian border, and from there he hiked over hundreds of miles through Colombian jungle to Bogota. He forded rivers, avoided local bandits, and hid from the FARC and various militias along the way. His journey began on August 21, 2020, and took 15 days to complete.

188.    On September 5, 2020, the U.S. State Department Official in Bogota personally arranged for Mr. Marrón's visa and re-entry into the United States. Mr. Marrón flew home and was reunited with his wife and children.

189.    Although Mr. Marrón and his family were, and remain, overjoyed at his return, they continue to suffer from the ordeal, including grappling with ongoing mental, emotional and physical issues. As is all too common with victims of terrorism and kidnapping, Mr. Marrón's marriage has suffered as well, and he and his now ex-wife divorced in 2022.

190.    In addition, while Mr. Marrón remained a political prisoner in Venezuela, his U.S. businesses collapsed.  During the time that Mr. Marrón was kidnapped, the DolarPro.com website ceased operations, rather than tolerate the risk that the Maduro Regime would take additional retaliatory actions against Mr. Marrón while he was in captivity.  Mr. Marrón had a business, based in Miami, Florida, that engaged in ticket sales. Shortly before Mr. Marrón was kidnapped, the

business (through Mr. Marrón's personal efforts) had closed a $7 million contract to sell tickets for Cirque du Soleil. That business collapsed during the two years when Mr. Marrón was unable to maintain the business because the Venezuelan Criminal Enterprise had kidnapped him.

### B.      Josh and Thamy Holt

191.    Joshua and Thamy B. Holt née Caleño (then 24 and 25 years old, respectively) met online, on Facebook, through a list of missionaries from the Church of Jesus Christ of Latter Day Saints ("LDS"). Thamy and Josh shared an instant rapport, even more so when Thamy learned that Josh spoke some Spanish, which he had picked up during his LDS missionary service. Before long, they transitioned from speaking over the internet to long and frequent phone calls and texts.

192.    In May 2016, Josh and Thamy met in person in the Dominican Republic. Three days later Josh got down on one knee and proposed marriage. Not long after, Josh traveled to Caracas so that he could meet Thamy's family. Josh arrived in Caracas on June 11, 2016, and on June 16, 2016, they were married. They moved into Thamy Holt's apartment, at the well-known Ciudad Caribia apartment complex in Caracas, Venezuela.

193.    But the Holts' joy was cut short just days later when, on June 30, 2016, masked, armed police—including agents of the Bolivarian National Intelligence Service (the Servicio Bolivariano de Inteligencia Nacional or "SEBIN"), i.e., Venezuelan secret police answerable to Maduro—raided the Ciudad Caribia complex, breaking into numerous apartments without cause and murdering seven residents.

194.    The police bullied their way into the Holts' apartment and planted a grenade in Mr. Holt's suitcase. Subsequently, the SEBIN falsely accused Mr. Holt of being involved in a Central Intelligence Agency (CIA) plot against Venezuela. Josh and Thamy were arrested and transported to the notorious El Helicoide prison, where the SEBIN held and tortured them for nearly two years.

195.    Thamy Holt recalls: "They covered my eyes, wrapped my arms in newspaper and electrocuted me with a taser, and they put the ends of my fingers in a pencil sharpener. I was so scared. They wanted me to sign a confession that Josh was part of an espionage plot, that he led a CIA team sent to undermine the Venezuelan government, that he had killed people. I just cried and refused."

196.    Josh Holt explained: "They threw me in a tiny cell barely big enough to fit a bunk bed in with no toilet. I had to crap on newspaper on the floor and pee in a bottle, the stench was unbearable." "In the first six months I dropped 60 lbs. in weight, I had bronchitis, scabies, kidney stones and hemorrhoids and the only medical attention I was given was a shot of pain killers."

197.    His cell was about the dimensions of a twin bed. The entire cell was covered in hundreds of squirming cockroaches and innumerable flies. It was unfurnished, except for a thin, dirty pad on the floor. The temperature in the cell was sweltering. There was no air flow—there were black plastic garbage bags taped up against the bars of his cell that blocked any possible breeze and few openings about 10 feet above that housed broken fans. Two fluorescent bulbs flooded the cell with light; those bulbs burned day and night, 24/7.

198.    After about a week in solitary, Josh felt a familiar pain in his back and side: he had developed a kidney stone. Unlike the last kidney stone he had when he was 16, when his parents took him to the ER, this time there would be no medical care whatsoever. He was in constant agony, laying on the ground, in his underwear, cockroaches swarming him, sweating profusely, and staying that way for days while the stone tore a path from his kidney and downward. "The pain that you feel is just radiating throughout your body, especially in spots where you don't want it to," such as the groin. The SEBIN provided Josh just a liter of water every few days, dehydrating him and exacerbating his efforts to pass his stone.

199.    The proper treatment for a kidney stone includes, at the least, pain medicine, additional medicine to open the flow of urine, and large quantities of water. What Josh received, therefore, was exactly the opposite of what his medical needs dictated. Josh screamed in pain and yelled for a doctor. This persisted for around a week and half, while Josh fought through the pain, until he passed the stone. At that point, Josh had still never been allowed to leave his cell to wash or to use the bathroom.

200.    Then, Josh learned that his next court date, supposedly scheduled to occur after 45 days, had been deferred indefinitely. It was soul-crushing news.

201.    After around 6 weeks, Josh was moved into a cell with three other individuals— all regular criminals (El Helicoide generally houses political prisoners separately from street criminals). His new cellmates, including a murderer nicknamed "The Donut," considered one of the ten most dangerous street criminals in Venezuela. Josh cautiously set up his thin pad on the floor, away from the Donut. Fortunately, Josh eventually established a delicate friendship with the Donut, who taught Josh the ropes: (1) share generously with other prisoners when asked in order to cultivate friendships—or be prepared to risk being murdered for something trivial, like toilet paper, (2) learn to read that guards, so you know when they may raid the cells, so that contraband, especially cell phones, can be moved to other locations, and (3) develop a side hustle to make money, if possible.

202.    Week after week, Josh watched other prisoners taken out (3 times a week) for a chance to see the sun. But he was not allowed to do the same. "I really wanted to go outside. I just wanted to get Vitamin D inside of me, and I just wanted to feel better." Josh argued with his SEBIN guard, saying he had the right to go out. Under international law, Josh was correct. The response: "Here in Venezuela, you don't have any rights." In the two years that Josh was in El Helicoide, he

says, "I could count on one hand the number of times I was able to see the sun."

203. Before long, Josh developed a cough that would not go away. At times he tasted blood, and he was having a hard time breathing—which was worse because his cellmates smoked and the cell lacked ventilation. He likely had bronchitis or pneumonia. The SEBIN offered no medical care.

204. Nor did the cell have a toilet. Due to the poor diet and resulting constipation, Josh developed a hemorrhoid—a potentially serious issue given the lack of hygiene and risk of infection in the El Helicoide. This time, the SEBIN allowed Josh to see a medic, who mistreated Josh, breaking the hemorrhoid and causing Josh to bleed profusely for the next three to four days.

205. Due to pressure from Josh's mother, Laurie Holt, and his family in the United States, and with the help of a lawyer they hired in Venezuela, a Venezuelan court ordered that Josh be taken to a hospital, but the SEBIN refused to comply. He never went to a hospital.

206. Josh also suffered from back pain, likely as a result of sleeping on the floor. He was given permission to get a bunk bed, but after using it, he began to itch terribly: it was scabies. Scabies occurs when microscopic mites dig through your skin to lay their eggs underneath. Eventually, Josh was able to obtain an iron from a fellow prisoner to iron his bed and kill the mites living on it.

207. One of the SEBIN guards developed a crush on Thamy, and so decided to make Josh's life as difficult as possible. That guard accused Josh of having a contraband cell phone, and thus, Josh was stripped naked and forced to do calisthenics in the hall while the SEBIN searched his cell. They found Donut's phone, and Donut blamed Josh, creating new dangers for Josh.

208. Thamy, through a friendship with a prisoner having an affair with the El Helicoide warden, was able to arrange a meeting between herself, Josh, and the warden. This led to Josh

65

being moved again, this time to a cell with political prisoners, whom El Helicoide houses separately from common criminals. Those prisoners, like Josh, were innocent of any crimes.

209.    Then, Josh chipped a tooth. For about four months, he received no medical care. The pain got so bad he began to get headaches on top of the dental pain. At long last, a dentist came to visit, and drilled Josh's tooth without anesthetics. But that shoddy care did not cure the problem. Instead, without any medicine and only dirty brown water to wash his mouth, Josh developed a raging infection, with pain radiating from his chin to his ear every moment of every day. Each day his gums would fill anew with puss, which he would have to manually drain, "like popping a zit," on a daily basis.

210.    As the days wore on, Josh began to feel hopeless and deeply depressed. He is not sure what pushed him over the edge, but after about 18 months, he began to feel that he was ready to just kill himself. "I didn't see a light at the end of the tunnel." Another time, he told his family that he was "sick of being scared out of his mind all the time." Eventually, Josh managed to lift himself out of depression, thinking of people at home praying for him, and contemplating an article on finding hope while in chains that Thamy's mother brought to him.

211.    Over the two years that Josh was held against his will in Venezuela, he lost sixty pounds.

212.    While Josh was being held in solitary, Thamy was placed in a cell with 32 other women. The resources were grossly inadequate. There were only two bathrooms. There were not enough bunks; Thamy had to share a 2-inch mattress on the floor with another prisoner. This aggravated Thamy's shoulder injury from when the SEBIN had tortured her. She requested medical attention to no avail.

213.    For the first week, the other women beat Thamy every day, apparently thinking that

she was an informant. In response, Thamy shifted her sleep so that she would be awake when the other women were asleep, making it easier for her to avoid them.

214. Thamy gathered water in a 2-liter bottle for herself when she could, but sometimes water would not flow to El Helicoide for up to a week. When it did flow, it was full of sediment that needed to settle before it could be used. When the pipes were down, the SEBIN would sometimes truck in water that was neither especially clean nor safe.

215. During Thamy's arbitrary detention, SEBIN officers continued to pressure her to agree with their false allegations against Josh, saying that he was a bad person and a spy, and threatening her that she would never see her children again unless she signed the paperwork condemning Josh. She held fast and declined.

216. All of Josh's family suffered in his absence. At birthdays, Christmases, and other celebrations, he was acutely missed. "The family was never whole," explains Derek Holt. Josh's sister Jenna got married while he was locked up in Venezuela, and his absence cast a pall over the wedding festivities. A photo stood in for Josh himself at the wedding; his relatives wept at the sight of it. "We all just lost it," explains Derek Holt. Jenna was heartbroken at Josh's absence. Jason Holt remembers having a father-daughter dance with Jenna, and wiping away a tear, in part in sadness that the whole family could not be together.

217. The Holt family suffered significant physical injuries in the United States.  For example:

     a. Laurie Holt—Plaintiff Joshua Holt's mother, who had no prior history of heart disease and was 50 years of age—suffered an enlarged heart and a fatal cardiac event on February 10, 2019, in Utah, as a direct and proximate physical injury caused by Defendants' acts of terrorism described herein.

67

b. Plaintiff Jason Holt, developed hypertension, gained substantial weight, and suffered severe gastroesophageal reflux and other gastrointestinal problems requiring treatment with omeprazole to manage symptoms and reduce the risk of ulcers.  He continues to experience significant sleep disturbance. The combined effects of chronic stress, anxiety, sleep disruption, and weight gain also contributed to the onset of diabetes mellitus that now requires pharmacologic management with metformin.

c. Plaintiff Derek Holt, while residing in Utah, suffered severe and chronic autonomic nervous system deregulation, causing a permanent physical alteration in his neurovascular pathway including panic attacks (accompanied by symptoms such as rapid heart rate, sweating, trembling, shortness of breath, dizziness) and depression. Mr. Holt's somatic anxiety manifested physically through recurrent, unprovoked cardiovascular panic episodes, during which Plaintiff suffered acute, measurable physical symptoms including severe tachycardia and profound hyperventilation resulting in physical hypoxia. These physical episodes were accompanied by severe neurological tremors, involuntary muscle fasciculations, as well as PTSD.

d. Plaintiff Jenna Nemeth, while residing in Utah, developed severe, acute, and measurable physiological trauma to her cutaneous and nervous systems manifested as an aggressive, physical outbreak of acute neurogenic urticaria and severe dermatitis, characterized by raised, erythematous, pruritic welts, and widespread edematous wheals or hives on multiple areas of her body.  She also suffered extensive epidermal excoriation, skin tearing, and permanent cutaneous scarring. These injuries were sustained in Utah and are a direct and proximate result of the

68

wrongful conduct alleged in this Complaint.

    e. Plaintiff Katie Holt, while residing in Utah, suffered physical injury to her central nervous system and circadian biological pathways, which included trauma impairing her natural sleep-wake architecture, causing a toxic disruption in the physical production of melatonin and serotonin within the pineal gland. This neurochemical defect manifests as severe, chronic somatic insomnia, which physically deprives Plaintiff's brain and body of essential rapid eye movement (REM) and deep-stage slow-wave sleep. Additionally, structural alterations in her brain chemistry, including the downregulation of neurotransmitter receptors and localized neurochemical atrophy, with somatic manifestations, led to a severe breakdown of Plaintiff's gastrointestinal and metabolic systems.

218. But Josh's family did not just suffer in silence. Mr. Holt's family, upon learning that Josh and Thamy had been kidnapped and were being arbitrarily detained, began a tireless crusade to obtain their release. Through relentless advocacy (especially by Josh's mother, Laurie Holt), the Holts were able to enlist the assistance of political luminaries including Senator Marco Rubio, Senator Orrin Hatch, and Representative Ludmya "Mia" Love, among others. Senator Rubio publicly and accurately proclaimed that Mr. Holt was an innocent "hostage" being held to extract concessions from the United States.

219. In response, the Maduro Regime threatened Mr. Holt that they would hold him captive "as long as Marco Rubio continues talking . . . ."

220. The threat to hold Mr. and Ms. Holt at length was prescient: for nearly two years, Maduro held Josh and Thamy in horrid, squalid, and life-threatening conditions. The breakthrough, leading to Josh and Thamy's release on May 26, 2018, came when Senator Bob Corker was visiting

69

Caracas in his capacity as Chairman of the Senate Foreign Relations Committee and met in person with Maduro, at which point Maduro relented.

221. The same day that Maduro allowed their release, Josh, Thamy, and Thamy's eldest daughter flew to the United States.

222. Later that day, they and Laurie Holt met in the oval office with President Trump, who welcomed them with open arms.

223. Unfortunately, the Holts' escape from Venezuela was not the end of the Holt family's ordeal. Josh and Thamy Holt both suffer from anxiety disorders, insomnia, and depression caused by the trauma they suffered. And Laurie Holt—who had been healthy before her son's ordeal, and who dedicated two years of her life to leading the high-stakes fight for his release— simply could not withstand the stress caused by her son's unlawful detention. Not long after Josh came home, Laurie (who had never had any heart issues) succumbed to an enlarged heart and passed away on February 10, 2019, at age 50.

224. The timing and means of Laurie's demise, in the wake of the family's ordeal at the hands of the Venezuelan Criminal Enterprise, is no coincidence.

225. It is well-known that families of kidnapping victims suffer enormous stress. The suffering, stress, and trauma on Laurie Holt was astronomical. Laurie's husband explains that Laurie Holt "hit rock bottom pretty bad" when Josh was being held as a hostage in Venezuela, adding "what parent wouldn't." Josh's friends, who routinely visited Laurie after church, said it was hard to see her suffering, and often crying, on a regular basis.

226. "Stress kills you because it damages the heart. Constant or prolonged stress is an important contributing factor to heart disease and the erosion of health in general. Over time the adrenalin released by stress hormones creates a continued state of vigilance with damaging

70

physiological consequences. Stress can kill you as it is known to lead to increased heart rate, cardiovascular problems, breathing difficulties and high blood pressure."[48]

227. Although the Venezuelan Criminal Enterprise did not kill Josh and Thamy Holt, it did kill Laurie Holt.

228. Eulogizing Laurie Holt, Senator Hatch said, "She never gave up. She was the true Mama Bear. And I miss her now that she has passed. I think of her often. We all could use a mother like that, let me tell you."

**COUNT I**
**<u>Violation of the Federal Anti-Terrorism Act, 18 U.S.C. § 2333</u>**
**(All Plaintiffs Against All Defendants)**

229. Plaintiffs incorporate by reference paragraphs 1 through 228 above as if fully set forth herein.

230. The ATA, 18 U.S.C. § 2333, provides:

> **Action and jurisdiction.—** Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

231. Plaintiffs are U.S. citizens and nationals of the United States. Accordingly, they are eligible to bring a claim under the ATA.

---

[48]*Stress Kills You: What Happens During and Following It*, Fairview Adult Day Care Center, (Mar. 2, 2020), https://fairviewadc.com/adult-day-care/stress-kills-you/; Carrie Tayrien, Stacey Wajcik, and Stephen Kang, *Stress Can Increase Your Risk for Heart Disease*, Health Encyclopedia, University of Rochester Medical Center, (2024) ("Even minor stress can trigger heart problems like poor blood flow to the heart muscle. This is a condition in which the heart doesn't get enough blood or oxygen. And long-term stress can affect how the blood clots. This makes the blood stickier and increases the risk of stroke."), https://www.urmc.rochester.edu/encyclopedia/content.aspx?ContentTypeID=1&ContentID=217 1#:~:text=Even%20minor%20stress%20can%20trigger,increases%20the%20risk%20of%20stro ke.

232.    Under 18 U.S.C. § 2331 ("Definitions"), the term "International Terrorism," for purposes of the ATA, means activities that:

> **(A)** involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> **(B)** appear to be intended—
>
> > **(i)** to intimidate or coerce a civilian population;
> >
> > **(ii)** to influence the policy of a government by intimidation or coercion; or
> >
> > **(iii)** to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> **(C)** occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

233.    Defendants violated the ATA by providing material support for the terrorism committed by the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro.

234.    ***Provision of funds and money laundering services, including through the United States.***  Defendants violated the ATA through the provision of funds and money laundering services directly to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro.  That financial support enabled the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro to expand and support their coercive apparatus (including the DGCIM and SEBIN), making politically motivated hostage-taking a foreseeable consequence.

   a.  First, providing funding and money laundering services to terrorists is dangerous to human life.  Here, such funding was at all relevant times essential to the

72

Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro in their commission terrorism against U.S. citizens, such as Mr. Holt, Ms. Holt, and Mr. Marrón. "Giving money to [a terrorist], like giving a loaded gun to a child . . . is an 'act dangerous to human life.'" *Boim v. Holy Land Found.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc).

b.  Second, because Defendants' provision of money and money laundering services was intended to fund acts of terrorism by Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro, the Defendants' provision of money and services violated federal prohibitions against providing material support to terrorists.

　　i.  18 U.S.C. § 2339A makes it a crime to knowingly provide material support or resources knowing or intending that the funds will be used for, *inter alia*, hostage taking in violation of 18 U.S.C. § 1203 or torture of a U.S. citizen at a location outside of the United States in violation of 18 U.S.C. § 2340A. The Defendants violated Section 2339C by knowingly collecting funds and laundering funds for the benefit of the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro, intending that the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro would utilize the funds to further his hostage taking and torture of U.S. citizens.

　　ii.  18 U.S.C. § 2339C makes it a crime to knowingly provide or collect funds with the intention that the funds be used, in full or in part, to

73

cause death or serious injury to a civilian, for the purpose of intimidating a civilian population, or for the purpose of compelling a government to take or refrain from taking an action. The Defendants violated Section 2339C by knowingly providing funds to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro, intending that they would use the funds, in whole or in part, to (1) cause death or injury to a civilian and (2) (a) cause injury or death to a civilian (e.g., kidnapping US persons) and (b) compel the government of the United States to provide various benefits to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro (such as releasing imprisoned Venezuelan drug traffickers and money launderers).

c. Third, the violations described above appear to be intended:

    i. to intimidate or coerce a civilian population, in that a reasonable, neutral observer would conclude that the intention behind the Defendants' provision of funds to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro was to intimidate the civilian population of Venezuela and the United States;

    ii. to influence the policy of a government by intimidation or coercion in that a reasonable, neutral observer would conclude (a) that the intention behind the Defendants' provision of funds to the Venezuelan Criminal Enterprise, the Venezuelan Criminal

Conspiracy, and Maduro was to influence the policy of U.S. government, with to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro using the funds to continue to kidnap U.S. citizens to extort concessions from the United States;

    iii.    to affect the conduct of a government by mass destruction, assassination, or kidnapping, in that a reasonable, neutral observer would conclude (a) that the intention behind the Defendants' provision of funds to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro was to affect the conduct of U.S. government by kidnapping, with the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro using the funds to continue to kidnap U.S. citizens to extort concessions from the United States.

d.    The acts of terrorism described above transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum, in that (1) the terrorist fund raising begins with narcotics shipments from South America and continues with narcotics sales in the United States and/or begins with currency scam, public corruption, and other unlawful activity in South America, (2) the terrorist fund raising and provision of financial services to terrorists continues with funds being laundered through the United States and elsewhere around the globe, and ultimately with funds being returned to the control

(and/or repatriated to) the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro, (3) the perpetrators are based in Venezuela, while the victims of narco-terrorism are located in the United States, as are the families of kidnapping victims, and (4) the perpetrators of kidnapping, arbitrary detention and torture are based in Venezuela, but the concessions they seek to affect (such as the release of prisoners incarcerated in U.S. prisons and jails) are within the United States.

235. The Defendants' funding of terrorists—i.e., the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro—was the cause of the injuries suffered by Plaintiffs, to their persons, property and business. The kidnapping, arbitrary detention and torture of Mr. Holt, Ms. Holt, and Mr. Marrón were the foreseeable consequences, and a substantial factor in the sequence of responsible causation, following from the Defendants' (1) raising massive amounts of funds to prop up the struggling and virulently anti-American Maduro, as well the Venezuelan Criminal Enterprise and the Venezuelan Criminal Conspiracy, and (2) funneling money to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro knowing that they use funds to commit acts of terrorism including kidnapping, arbitrary detention and torture against U.S. citizens.

236. The Defendants' providing financial services (in the form of money laundering) for terrorists—i.e., the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro—was the cause of the injuries suffered by Plaintiffs, to their persons, property and business. The kidnapping, arbitrary detention and torture of Mr. Holt, Ms. Holt, and Mr. Marrón were the foreseeable consequences, and a substantial factor in the sequence of responsible causation, following from the Defendants' (1) assisting the struggling and virulently anti-

76

American Maduro, as well as the Venezuelan Criminal Enterprise and Venezuelan Criminal Conspiracy, to obfuscate their criminal conduct and the criminal origins of their wealth, (2) providing laundered money to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro knowing that they use funds to commit acts of terrorism including kidnapping, arbitrary detention and torture against U.S. citizens.

237.   ***Narco-terrorist smuggling and sales of cocaine in the United States.***  PDVSA's provision of material support to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro through the narco-terrorist smuggling to, and sale of, cocaine in the United States is an act of terrorism that gives rise to liability under the ATA.

    a.   First, narcoterrorism is dangerous to human life in the United States. *See* Maduro Indictment, para. 4 ("the Cartel de Los Soles, under the leadership of [Maduro] and others, prioritized using cocaine as a weapon against America").

    b.   Second, narcoterrorism violates both state and federal law prohibiting narcoterrorism and prohibiting the trafficking of cocaine.  *See* 21 U.S.C. § 841; 21 U.S.C. § 960(a); Fla. Stat. § 893.135(1)(b);

    c.   Third, the violations described above appear to be intended:

        i.   to intimidate or coerce a civilian population, in that a reasonable, neutral observer would conclude that the intention behind the PDVSA's narco-terrorist sales of cocaine in the United States was to intimidate or coerce the civilian population of the United States;

        ii.   to influence the policy of a government by intimidation or coercion in that a reasonable, neutral observer would conclude PDVSA's narcoterrorism was intended to directly affect U.S. policy by

harming U.S. citizens and indirectly affect U.S. policy by obtaining funding to underwrite the kidnapping of U.S. citizens and to prop up a Venezuelan regime that U.S. deemed illegitimate;

iii. to affect the conduct of a government by mass destruction, assassination, or kidnapping, in that a reasonable, neutral observer would conclude that narcoterrorism is intended to affect U.S. government conduct by (a) causing mass destruction in the form of the devastation of the health of communities plagued by cocaine addiction and (b) supporting kidnapping that is funded by proceeds of narcotics trafficking and that was utilized to obtain the release of imprisoned Venezuelan narcotics traffickers, thereby further supporting narcotics trafficking.

d. The acts of terrorism described above transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum, in that (1) the narcoterrorism and cocaine smuggling begins with narcotics shipments from South America and continues with narcotics sales in the United States, (2) the proceeds of the narcoterrorism are laundered through the United States and elsewhere around the globe, with funds ultimately being returned to the control (and/or repatriated to) the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro, (3) the perpetrators are based in Venezuela, while the victims of narcoterrorism are located in the United States, as are the families of kidnapping victims, (4) the perpetrators of kidnapping, arbitrary

detention and torture are based in Venezuela, but the concessions they seek to affect (such as the release of prisoners incarcerated in U.S. prisons and jails) are within the United States, (5) the concessions sought include the release from U.S. prisons and jail of Venezuelan money launderers and narcotics traffickers.

238.   PDVSA's narcotrafficking was the cause of the injuries suffered by Plaintiffs, to their persons, property and business. The kidnapping, arbitrary detention and torture of Mr. Holt, Ms. Holt, and Mr. Marrón were the foreseeable consequences, and a substantial factor in the sequence of responsible causation, following from the PDVSA's narcotrafficking, not only because the proceeds of narcotrafficking were utilized to fund the kidnapping, and indeed to allow prop up the struggling Maduro regime that would otherwise have been unable to commit such kidnappings, but also because the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro utilized the kidnappings to obtain the release from U.S. prison of convicted narcotics traffickers and the release from U.S. jail of an indicted money launderer. Given that pattern, it is plain that ongoing narcoterrorism would support additional kidnappings of U.S. citizens.

239.   Plaintiff Joshua suffered injury to his person, property and business. Among other things, he suffered from being kidnapped, tortured, and arbitrarily detained for 695 days (from June 30, 2016 to May 26, 2018).

240.   Plaintiff Thamy Holt suffered injury to his person, property and business. Among other things, she suffered from being kidnapped, tortured, and arbitrarily detained for 695 days (from June 30, 2016 to May 26, 2018).

241.   Plaintiff Derek Holt suffered injury to his person, property and business as a result of Joshua Holt's kidnapping.  Among other things, he suffered a loss of solatium, loss of

79

consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.  Derek Holt also suffered physical injuries including  severe and chronic autonomic nervous system deregulation, permanent physical alteration in his neurovascular pathway, panic attacks accompanied by rapid heart rate, sweating, trembling, shortness of breath, and dizziness, severe tachycardia and profound hyperventilation, severe neurological tremors, and involuntary muscle fasciculations.

242.    Plaintiff Jason Holt suffered injury to his person, property and business as a result of Joshua Holt's kidnapping.  Among other things, he suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel. Jason Holt also suffered physical injuries including hypertension, substantial weight gain, gastroesophageal reflux, other gastrointestinal problems, significant sleep disturbance, and diabetes mellitus.

243.    Plaintiff Katie Jill Holt suffered injury to her person, property and business as a result of Joshua Holt's kidnapping.  Among other things, she suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.  Plaintiff Katie Holt also suffered physical injuries including physical injury to her central nervous system and circadian biological pathways, impairment to her sleep-wake architecture, toxic disruption in production of melatonin and serotonin, downregulation of neurotransmitter receptors and localized neurochemical atrophy, and a severe breakdown of her gastrointestinal and metabolic systems.

244.    Plaintiff Jenna Lee Nemeth née Holt suffered injury to her person, property and business as a result of Joshua Holt's kidnapping.  Among other things, she suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss

80

companionship, comfort, protection, attention, advice, and counsel.  Plaintiff Jenna Nemeth also suffered physical injuries including physiological trauma to her cutaneous and nervous systems, acute neurogenic urticaria, severe dermatitis, raised, erythematous, pruritic welts, and widespread edematous wheals, extensive epidermal excoriation, skin tearing, and permanent cutaneous scarring.

245.    Plaintiff M.L. suffered injury to his person, property and business as a result of Joshua Holt's kidnapping.  Among other things, he suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

246.    Plaintiff N.C. suffered injury to his person, property and business as a result of Joshua Holt's kidnapping.  Among other things, he suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

247.    Plaintiff Carlos Eduardo Marrón suffered injury to his person, property and business. Among other things, he suffered from being kidnapped, tortured, and arbitrarily detained for 635 days (from April 11, 2018 to January 6, 2020).

248.    Plaintiff Maria Alejandra Alfonzo suffered injury to her person, property and business as a result of Carlos Marrón's kidnapping.  Among other things, she suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.  Plaintiff Maria Alejandra Alfonzo also suffered physical injuries including Raynaud's syndrome and  recurrent outbreaks of carbuncles.

249.    Plaintiff Carlos Rafael Marrón suffered injury to his person, property and business

as a result of Carlos Marrón's kidnapping.  Among other things, he suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

250.   Plaintiff S.A., a minor, suffered injury to her person, property and business as a result of Carlos Marrón's kidnapping.  Among other things, she suffered a loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss companionship, comfort, protection, attention, advice, and counsel.

251.   Plaintiffs seek an award of compensatory damages (including treble damages) for the foregoing injuries, plus reasonable attorneys' fees and costs.

## COUNT II
## Violation of the Florida Anti-Terrorism Act, Fla. Stat. § 772.13
### (All Plaintiffs against All Defendants for Terrorism)

252.   Plaintiffs incorporate by reference paragraphs 1 through 228 above as if fully set forth herein.

253.   Florida Statute Section 772.13 provides in relevant part:

> A person who is injured by an act of terrorism as defined in § 775.30 or a violation of a law for which the penalty is increased pursuant to § 775.31 for facilitating or furthering terrorism has a cause of action for threefold the actual damages sustained and, in any such action, is entitled to . . . reasonable attorney fees and court costs in the trial and appellate courts.

254.   Defendants violated the Florida ATA by providing material support for the terrorism committed by the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro.

255.   Defendants' provision of funds directly enabled Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro to expand and support its coercive apparatus (including the DGCIM and SEBIN) making politically motivated hostage-taking a foreseeable consequence.

256. The Defendants' provision of funding and financial services to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro is an act of terrorism under Florida law that gives rise to primary liability under the Florida ATA.

a. First, providing funding and money laundering services to terrorists is dangerous to human life. Here, such funding was at all relevant times essential to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro in their commission terrorism against U.S. citizens, such as Mr. Holt, Ms. Holt, and Mr. Marrón. "Giving money to [a terrorist], like giving a loaded gun to a child . . . is an 'act dangerous to human life.'" *Boim v. Holy Land Found.*, 549 F.3d 685, 690 (7th Cir. 2008) (en banc).

b. Second, because Defendants' provision of money and money laundering services was intended to fund acts of terrorism by Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro, the Defendants' provision of money and services violated federal prohibitions against providing material support to terrorists.

i. 18 U.S.C. § 2339A makes it a crime to knowingly provide material support or resources knowing or intending that the funds will be used for, *inter alia*, hostage taking in violation of 18 U.S.C. § 1203 or torture of a U.S. citizen at a location outside of the United States in violation of 18 U.S.C. § 2340A. The Defendants violated Section 2339C by knowingly collecting funds and laundering funds for the benefit of the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro, intending that the Venezuelan

83

Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro would utilize the funds to further his hostage taking and torture of U.S. citizens.

ii. 18 U.S.C. § 2339C makes it a crime to knowingly provide or collect funds with the intention that the funds be used, in full or in part, to cause death or serious injury to a civilian, for the purpose of intimidating a civilian population, or for the purpose of compelling a government to take or refrain from taking an action. The Defendants violated Section 2339C by knowingly providing funds to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro, intending that they would use the funds, in whole or in part, to (1) cause death or injury to a civilian and (2) (a) cause injury or death to a civilian (e.g., kidnapping US persons) and (b) compel the government of the United States to provide various benefits to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro (such as releasing imprisoned Venezuelan drug traffickers and money launderers).

c. Third, Defendants' conduct meets the mens rea requirement of the definition of terrorism under Florida law.

i. Defendants' conduct was intended to intimidate or coerce a civilian population, in that Defendants' provision of funds to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro was to intimidate the civilian populations of Venezuela and

84

the United States, with Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro using the funds to commit acts of terrorism and narcoterrorism against U.S. citizens, and to commit acts of torture against Venezuelan citizens;

ii. Defendants' conduct was intended to influence the policy of a government by intimidation or coercion, in that the intention behind the Defendants' provision of funds to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro was to affect the conduct of U.S. government by kidnapping, with the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro using the funds to continue to kidnap U.S. citizens to extort concessions from the United States.

iii. Defendants' conduct was intended to influence the policy of a government through destruction of property, assassination, murder, kidnapping, or aircraft piracy in that the intention behind the Defendants' provision of funds to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro was to influence the policy of U.S. government, with to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro using the funds to continue to kidnap U.S. citizens to extort concessions from the United States;

257. The Defendants' funding of terrorists, i.e., the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro, was the cause of the injuries suffered by Plaintiffs.

85

The kidnapping, arbitrary detention and torture of Mr. Holt, Ms. Holt, and Mr. Marrón were the foreseeable consequences, and a substantial factor in the sequence of responsible causation, following from the Defendants (1) raising massive amounts of funds to prop up the struggling and virulently anti-American Maduro regime and (2) funneling money to Maduro knowing that he uses funds to commit acts of terrorism including kidnapping, arbitrary detention and torture against US citizens.

258.    ***Narco-terrorist smuggling and sales of cocaine in the United States.***  PDVSA's provision of material support to the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro through the narco-terrorist smuggling to, and sale of, cocaine in the United States is an act of terrorism that gives rise to liability under the Florida ATA.

a.  First, narcoterrorism is dangerous to human life in the United States. *See* Maduro Indictment, para. 4 ("the Cartel de Los Soles, under the leadership of [Maduro] and others, prioritized using cocaine as a weapon against America").

b.  Second, narcoterrorism violates both state and federal law prohibiting narcoterrorism and prohibiting the trafficking of cocaine.  *See* 21 U.S.C. § 841; 21 U.S.C. § 960(a); Fla. Stat. § 893.135(1)(b);

c.  Third, Defendants' conduct meets the mens rea requirement of the definition of terrorism under Florida law.

i.  Defendants' conduct was intended to intimidate or coerce a civilian population, in that the intention behind the PDVSA's narco-terrorist sales of cocaine in the United States was to intimidate or coerce the civilian population of the United States;

ii.  Defendants' conduct was intended to influence the policy of a

government by intimidation or coercion, in that PDVSA's narcoterrorism was intended to directly affect U.S. policy by harming U.S. citizens and indirectly affect U.S. policy by obtaining funding to underwrite the kidnapping of U.S. citizens and to prop up a Venezuelan regime that U.S. deemed illegitimate;

iii.  Defendants' conduct was intended to influence the policy of a government through destruction of property, assassination, murder, kidnapping, or aircraft piracy in that narcoterrorism is intended to affect U.S. government conduct by (a) causing mass destruction in the form of the devastation of the health of communities plagued by cocaine addiction and (b) supporting kidnapping that is funded by proceeds of narcotics trafficking and that was utilized to obtain the release of imprisoned Venezuelan narcotics traffickers, thereby further supporting narcotics trafficking.

259.    PDVSA's narcotrafficking was the cause of the injuries suffered by Plaintiffs, to their persons, property and business. The kidnapping, arbitrary detention and torture of Mr. Holt, Ms. Holt, and Mr. Marrón were the foreseeable consequences, and a substantial factor in the sequence of responsible causation, following from the PDVSA's narcotrafficking, not only because the proceeds of narcotrafficking were utilized to fund the kidnapping, and indeed to allow prop up the struggling Maduro regime that would otherwise have been unable to commit such kidnappings, but also because the Venezuelan Criminal Enterprise, the Venezuelan Criminal Conspiracy, and Maduro utilized the kidnappings to obtain the release from U.S. prison of convicted narcotics traffickers and the release from U.S. jail of an indicted money launderer.

Given that pattern, it is plain that ongoing narcoterrorism would support additional kidnappings of U.S. citizens.

260. Plaintiffs seek an award of compensatory damages (including treble damages) for the foregoing injuries, plus reasonable attorneys' fees and costs.

## COUNT III
### Furthering Terrorism Under the Florida ATA
(By All Plaintiffs Against All Defendants)

261. Plaintiffs incorporate by reference paragraphs 1 through 228 above as if fully set forth herein.

262. The Florida ATA provides for secondary liability, including allowing civil recovery for both conspiracy or aiding and abetting.

263. In relevant part, the Florida ATA provides: "[a] person who is injured by a violation of a law for which the penalty is increased pursuant to s. 775.31 for facilitating or furthering terrorism has a cause of action for threefold the actual damages sustained . . ." Fla. Stat. 772.13(1).

264. "A violation of the law for which the penalty is increased under 775.31" is any "felony or misdemeanor that facilitated or furthered any act of terrorism." Fla. Stat. 775.31(1).

265. The kidnapping, false imprisonment, and torture of Mr. Holt, Ms. Holt,, and Mr. Marrón were acts of terrorism.

266. PDVSA and CVP joined the Venezuelan Criminal Conspiracy, the object of which was the commission of a variety of interrelated crimes, including but not limited to (a) narcotics trafficking and narco-terrorism against the United States; (b) unlawful funding and provision of material support to terrorists through and from within the United States; (c) money laundering to, through and within the United States; (d) kidnapping, arbitrary detention, and torture of U.S. citizens (as well as Venezuelan citizens); and (e) public corruption offenses, bribery,

88

embezzlement of government funds, and the like, in Venezuela. PDVSA shared and agreed to these objectives and was central to the successful operation of the conspiracy.

267. PDVSA's intent to join the conspiracy and agreement to its objectives is illustrated by, among other things: (a) PDVSA's provision of aircraft for use in transporting kidnap victims; (b) PDVSA's luring U.S. citizens to Venezuela on false pretenses so that they could be kidnapped; (c) PDVSA's provision of aircraft for use in narcotrafficking into the United States; (d) PDVSA's laundering of the proceeds of narcotics trafficking; (e) PDVSA's employment of senior executives who were closely affiliated with and loyal to Maduro; (f) PDVSA's employment of senior executives who are leaders of the Cartel of the Suns; (g) PDVSA's close relationship with Alex Saab, whose release from U.S. prison Maduro obtained by exchanging Venezuela's release of U.S. hostages for the U.S. releasing Saab; and (h) PDVSA's close relationship, at its most senior levels, with Maduro.

268. CVP's intent to join the conspiracy and agreement to its objectives is illustrated by, among other things: (a) CVP's leading role in the laundering of money for PDVSA, the Cartel and Maduro; (b) CVP's acts to personally enrich Maduro and his family with the proceeds of stolen oil and oil-related graft; (c) CVP doling out graft proceeds to ensure that key Maduro constituents, including civilian elites, military leaders, and Cartel kingpins remained loyal to Maduro, especially at inflection points when Maduro was besieged by critics from within and without, beleaguered with economic woes, and facing headwinds due to Maduro's rising unpopularity at home and abroad; (d) CVP's participation in developing techniques and infrastructure that facilitate the trafficking in cocaine; and (e) CVP's close relationship with Maduuro.

269. Participation in the Venezuelan Criminal Conspiracy is a felony, because its objectives are felonies. *See, e.g.,* Fla. Stat. 787.01 (criminal prohibition against kidnapping); Fla.

89

Stat. 777.04 (criminal conspiracy); Fla. Stat.  § 893.135(1)(b)1 (criminal prohibition against trafficking cocaine); Fla. Stat. 777.04 (criminal conspiracy); Fla. Stat.  § 775.33(2)(a) (criminal prohibition against money laundering on behalf of terrorists); Fla. Stat. 775.33(2)(c) (criminal conspiracy to do the same).

270. Further, the Venezuelan Criminal Conspiracy furthered or facilitated an act of terrorism, i.e., it furthered or facilitated the kidnapping, false imprisonment, and torture of the Mr. Holt, and Mr. Marrón.  Not only was kidnapping itself an object of the conspiracy, but moreover, kidnapping was intrinsic to, and furthered, the other objectives of the conspiracy, e.g., by suppressing opposition to Maduro's totalitarian control of Venezuela, which was essential to the continued ability of the members of Venezuelan Criminal Conspiracy to commit crimes with relative impunity.

271. Accordingly, PDVSA and CVP's participation in the Venezuelan Criminal Conspiracy gives rise to liability under the Florida ATA.

272. Plaintiffs seek an award of compensatory damages (including treble damages) for their injuries, plus reasonable attorneys' fees and costs.

**COUNT IV**
**<u>Common Law Conspiracy</u>**
**(By All Plaintiffs Against All Defendants)**

273. Plaintiffs incorporate by reference paragraphs 1 through 228 above as if fully set forth herein.

274. PDVSA and CVP joined the Venezuelan Criminal Conspiracy, the object of which was the commission of a variety of interrelated crimes, including but not limited to (a) narcotics trafficking and narco-terrorism against the United States; (b) unlawful funding and provision of material support to terrorists through and from within the United States; (c) money laundering to, through and within the United States; (d) kidnapping, arbitrary detention, and torture of U.S.

90

citizens (as well as Venezuelan citizens); and (e) public corruption offenses, bribery, embezzlement of government funds, and the like, in Venezuela.  PDVSA and CVP shared and agreed to these objectives and were central to the successful operation of the conspiracy.

275.    The kidnapping, torture and arbitrary detention of Mr. Holt, Ms. Holt, and Mr. Marrón were overt acts in furtherance of that Venezuela Criminal Conspiracy.

276.    Plaintiffs seek an award of compensatory damages for the foregoing injuries, the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future, and reasonable attorneys' fees and costs.

## COUNT V
## Federal Civil RICO, 18 U.S.C. § 1964(c)
### (By All Plaintiffs Against All Defendants)

277.    Plaintiffs incorporate by reference paragraphs 1 through 228 above as if fully set forth herein.

278.    RICO, 18 U.S.C. § 1962(c), makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . " 18 U.S.C. § 1962(c).

279.    ***Persons***. PDVSA and CVP each is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3), and therefore each Defendant has capacity to violate RICO, 18 U.S.C. § 1962(c), which applies to such "persons."

280.    ***The Venezuela Criminal Enterprise***. The "Venezuelan Criminal Enterprise" is an association-in-fact that includes, among others, PDVSA, CVP, Maduro and the Cartel of the Suns.

281.    The Venezuelan Criminal Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) because the enterprise engaged in the conduct of its affairs through a continuing pattern of racketeering activity. The members of the enterprise functioned as a

continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. The Venezuelan Criminal Enterprise is the poster child for what Congress had in mind when it created a civil RICO remedy: a well-organized, long standing, hierarchical crime syndicate engaged in myriad violent criminal endeavors.

282.    In the alternative Maduro's unlawful de facto "government in Venezuela (the "Maduro Regime"), the Cartel of Suns, PDVSA, and CVP each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Alternative Enterprises").

283.    ***Interstate and Foreign Commerce***. The Venezuelan Criminal Enterprise and the Alternative Enterprises have engaged in, and their activities have affected, interstate and foreign commerce.

284.    ***Pattern of Racketeering Activity***. Defendants, each of whom is a person associated with the Venezuelan Criminal Enterprise and/or the Alternative Enterprises, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and l962(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

285.    Defendants each committed at least two predicate acts of racketeering activity that are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1), as more specifically alleged below.

286.    The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous. There was

92

repeated conduct during a period of time beginning in 2013 (when Maduro became President of Venezuela following the death of Hugo Chavez), if not sooner, and continuing until at least Maduro was captured by the United States on January 3, 2026, and possibly to the present. Moreover, there is a continued threat of repetition of such conduct.

287.    Plaintiffs specifically allege that Defendants participated in the operation and management of the Venezuelan Criminal Enterprise and the Alternative Enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

288.    ***Predicate: Conspiracy to commit narco-terrorism (All Defendants)***. RICO predicates include "any offense involving . . . the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance." See 18 U.S.C. § 1961. Defendant Maduro committed acts indictable for offenses "involving the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance," and in fact has been indicted for a narco-terrorism conspiracy beginning in 1999 and continuing through today, in violation of 21 U.S.C. § 960a, the object of which was to violate 21 U.S.C. § 841(a) (distribution of five kilograms or more of cocaine), "knowing and intending to provide, directly and indirectly, something of pecuniary value to a person and organization that has engaged and engages in terrorism and terrorist activity." PDVSA joined this conspiracy, and in support of it, among other things, PDVSA provided aircraft for the transport of cocaine, laundered the proceeds of cocaine sales, and utilizing proceeds of oil graft to enrich Maduro and members of the Cartel of the Suns.  CVP joined this conspiracy, and in support of it, among other things, CVP (including through its subsidiaries and joint ventures) laundered the proceeds of the sales of cocaine and utilizing proceeds of oil graft to enrich Maduro and members of the Cartel of the Suns.

93

289. ***Predicate: Cocaine importation conspiracy (All Defendants)***. RICO predicates include "any offense involving . . ." the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance." See 18 U.S.C. § 1961. Maduro committed acts indictable for offenses "involving the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance," and in fact has been indicted for a cocaine importation conspiracy that began in 1999 and continues through today, including importing cocaine into the United States from abroad in violation of 21 U.S.C. § 952(a) and 21 U.S.C. § 960(a)(1), and including manufacturing, distributing and possessing with intent distribute cocaine knowing, and having reasonable cause to believe that the cocaine would be unlawfully imported in the United States, in violation of 21 U.SC. § 959(a) and 21 U.S.C. § 960(a)(3), and possessing cocaine with intent to distribute on board an aircraft registered in the United States in violation of 21 U.S.C. § 959(c) and 21 U.S.C. § 960(a)(3). Maduro committed this offense in conspiracy with PDVSA and CVP.

290. ***Predicate: Conspiracy to commit kidnapping (All Defendants)***. RICO predicates include "any act or threat involving murder [or] kidnapping . . . which is chargeable under State law and punishable by imprisonment for more than one year." See 18 U.S.C. § 1961. Conspiracy to commit kidnapping is an act involving kidnapping that is chargeable under State law (including the law of Florida) and punishable by imprisonment of more than a year. PDVSA and CVP joined the conspiracy to kidnap Americans, pursuant to which Maduro kidnapped Mr. Holt, Ms. Holt, and Mr. Marrón.  Among other things, PDVSA routinely provided aircraft for use in transporting kidnapped U.S. citizens and PDVSA lured U.S. citizens to Venezuela on false pretenses so that they could be kidnaped upon their arrival.  CVP took instructions from, and shared executives with, PDVSA.  CVP relied extensively on Alex Saab to facilitate unlawful and clandestine sales

94

of its oil, and then when Saab was captured by the United States, Saab was released in exchange for U.S. citizens captured by Venezuela pursuant to the conspiracy to commit kidnapping. CVP laundered narcotics proceeds and enriched the Cartel of the Suns and Maduro, furthering their ability, and need, to kidnap U.S. citizens.

291. The conspiracy is chargeable in Florida and conduct constituting an element of the offense occurred in Florida. Specifically, overt acts in furtherance of the conspiracy occurred in Florida where Alex Saab was incarcerated in Miami, before the United States released him to obtain the return of U.S. citizens who were kidnapped pursuant to the conspiracy. And Mr. Marrón lived in Florida and ran the DolarPro.com website from Florida, which the kidnappers destroyed when they kidnapped Mr. Marrón. The kidnappers also tortured Mr. Marrón until he revealed how to access his savings electronically, and the kidnappers then drained those Florida accounts.

292. ***Predicate: Money Laundering Violations (All Defendants).*** RICO predicates include criminal money laundering in violation of 18 U.S.C. § 1956 and 18 U.S.C. § 1957. Defendants laundered the proceeds of Maduro and the Cartel's drug running through the United States, especially South Florida. Defendants also launder the proceeds of crimes against a foreign nation, including crimes against Venezuela such as sale and distribution of controlled substances, kidnapping, and embezzlement of public funds for the benefit of a public official.

293. ***Predicate: Travel Act violations (All Defendants)***. Violations of the Travel Act, 18 U.S.C. § 1952, are RICO predicate offenses. Under the Travel Act, it is unlawful to use "any facility of interstate or foreign commerce" (which includes any "means of communication," *see* 18 U.S.C. § 1958(b)(2)) to "promote, manage, establish, carry on or facilitate the promotion, management, establishment and carrying on, of any unlawful activity" or to "commit any crime of violence to further unlawful activity." The Travel Act defines the term "unlawful activity" to

95

include, among other things, "any business enterprise involving . . . narcotics or controlled substances." *Id*. § 1952(b)(1). Here, Defendants committed offenses indictable under the Travel Act because they used a facility of interstate or foreign commerce to promote, carry on or facilitate an unlawful activity (i.e., their narcotics trafficking business).

294. ***Continuity of Conduct***. Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Plaintiffs, constituted a continuous course of conduct spanning a period from at least 2013 to the present, which was intended to obtain money through narcoterrorism, narcotics trafficking, money laundering, public corruption offenses, and other improper and unlawful means, and further intended to suppress opposition to the illegitimate dictatorship of Maduro and to their ongoing corruption and narcotics offenses described herein. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. § 1961(l) and (5).

295. ***Conduct of Affairs***. Defendants have conducted and participated in the conduct of the affairs of the Venezuelan Criminal Enterprise and the Alternative Enterprises through a pattern of racketeering activity as alleged above in violation of 18 U.S.C. § 1962(c).

296. ***Proximate cause and damages to business and property***. The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to the Plaintiffs in their business or property. Plaintiff seeks an award of damages in compensation for, among other things, the property that Defendants stole from Mr. Marrón, and Mr. Holt when they were kidnapped, the destruction of Mr. Marrón's DolarPro.com website and related business, the destruction of Mr. Marrón's ticket vending business, and the theft of Mr. Marrón's assets from his U.S. bank accounts.

297. Plaintiffs seek an award of compensatory damages (including treble damages) for

96

the foregoing injuries, plus reasonable attorneys' fees and costs.

## COUNT VI
### Conspiracy to Violate Federal Civil RICO, 18 U.S.C. § 1962(d)
**(By All Plaintiffs Against All Defendants)**

298.    Plaintiffs incorporate by reference paragraphs 1 through 228 above as if fully set forth herein.

299.    In violation of 18 U.S.C. § 1962(d), Defendants, and each of them, knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as alleged above.

300.    The conspiracy commenced at least as early as 2013  and is ongoing.

301.    The purpose of the conspiracy is the commission of a variety of interrelated crimes, including but not limited to (a) narcotics trafficking and narco-terrorism against the United States; (b) unlawful funding and provision of material support to terrorists through and from within the United States; (c) money laundering to, through and within the United States; (d) kidnapping, arbitrary detention, and torture of U.S. citizens (as well as Venezuelan citizens); and (e) public corruption offenses, bribery, embezzlement of government funds, and the like, in Venezuela.

302.    Each Defendant committed at least one overt act in furtherance of such conspiracy.

303.    Even if some of the Defendants did not agree to harm Plaintiffs specifically, the purpose of the acts they engaged in was to advance the overall object of the conspiracy, and the harm to Plaintiffs was in furtherance of the conspiracy.

304.    Plaintiffs have been injured and continue to be injured in their business and property by Defendants' conspiracy in violation of 18 U.S.C. § 1962(d). The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs in their business and property.

305. Plaintiffs seek an award of compensatory damages (including treble damages) for the foregoing injuries, plus reasonable attorneys' fees and costs.

## I.PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court grant:

A. An award of compensatory damages, consequential damages, and treble damages.

B. An award of attorneys' fees, costs, and expenses.

C. A jury trial on all issues so triable.

D. Such other relief, as is just and proper.

Respectfully submitted on June 3, 2026.

*/s/ Jaime D. Guttman*
Fla. Bar No. 44076
*jaime@scale.law*
Scale Law Partners, LLC
777 Brickell Avenue, Suite 500
Miami, FL 33131
(786) 273-9033 (Main)

*Counsel for Plaintiffs*